## SHAEFFER *v.* SLEADE and Others.

When a party to a contract places a known trust and confidence in the other party, and acts upon his opinion, any misrepresentation by the party confided in, in a material matter constituting an inducement or motive to the act of the other party, and by which an undue advantage is taken of him, is regarded as a fraud against which equity will relieve.

At law, an action may be maintained for false representations, made by a vendor to a purchaser, of matters within the peculiar knowledge of the vendor, whereby the purchaser is injured.

Applications to a Court of chancery for the exercise of its jurisdiction to rescind a contract are addressed to the sound discretion of the Court; but

'such discretion must be exercised in conformity with established principles.

A contract will not in general be rescinded when the contracting parties cannot be placed in the identical situation which they occupied when the contract was made. And even when they can be so placed, the contract will not be rescinded, if the application to rescind be not made within a reasonable time.

In a chancery suit before the Supreme Court on a writ of error, the Court may render such a decree on the merits as the justice of the case requires.

May Term, 1844.

SHAEFFER
v.
SLEADE.

Thursday, July 11.

ERROR to the *Clark* Circuit Court.

SULLIVAN, J.——The proceedings in this case commenced with a bill in chancery to foreclose a mortgage filed by *Shaeffer* against *Carr*, the mortgagor, *Prather*, a junior mortgagee, and *Matlack* to whom the prior mortgage had been assigned in trust and for the use of the complainant. Answers were filed which admitted the execution of the mortgage by *Carr*, and that the debt which it was given to secure was unpaid; that the mortgage had been assigned to *Matlack* in trust for the complainant; and that it was prior in date to the mortgage held by *Prather*. At this stage of the cause, *Sleade*, who had assigned to *Matlack* the debt against *Carr* and the mortgage by which it was secured, filed a petition setting forth that the assignment of the mortgage had been obtained from him by fraud, and praying that he might be made a defendant. The bill was amended by making him a defendant; whereupon he filed his answer to the complainant's bill, and his cross-bill making *Shaeffer* and *Matlack* defendants to it.

The answer and cross-bill of *Sleade* set forth the following facts, viz., that in *January* or *February*, 1839, *Matlack* arrived at *Jeffersonville*, having in his possession a barge containing a portrait of General *Washington* and fifty-six figures representing the signers of the Declaration of Independence, which *Matlack* was exhibiting to the public as "The grand national exhibition of the signers of the Declaration of Independence of the *United States;*" that *Sleade* visited the place of exhibition, and while there *Matlack* was prodigal in his statements of the great value of the property, and perceiving that the defendant was of a sanguine temperament, and that he had been struck with the singularity of the figures, continued his fraudulent misrepre-

sentations of the value of the property for the purpose of further exciting and duping him; that *Matlack* falsely represented himself to be the owner of one-half of said property, and that the other half was owned by persons resident east of the mountains; that the owners had amassed handsome fortunes from the profits of said exhibition in the eastern states; that at *Philadelphia* it had yielded more than 200 dollars daily, at *Pittsburg* a large amount, and at *Cincinnati* nearly 2,000 dollars. He further states that being so deceived by the representations of *Matlack*, he determined to purchase the barge and its contents if he could be satisfied of the durability of the material of which the figures were made and the validity of the title; that he communicated his intention to *Matlack*, who falsely and fraudulently represented the title to be good, and that the figures were made of a superior composition, having no wax in them, and could not be affected by heat or cold. The defendant alleges that all the foregoing representations of *Matlack* as to the ownership of the property, the composition of the figures, the profits derived from the exhibition of them, &c., were false and made to defraud him, and that being so deceived he purchased the property for the sum of 8,000 dollars; that he has paid part of the purchase-money, to wit, the sum of 2,000 dollars in cash; that he executed two notes, one for the sum of 1,000 dollars, and one for the sum of 900 dollars, in part consideration of said purchase, both of which remain unpaid, and for the residue assigned said note and mortgage of the defendant, *Carr*, for the sum of 4,000 dollars and the interest thereon, making altogether the sum of 8,000 dollars. He alleges an offer to return the property, and prays that the contract may be rescinded.

*Matlack's* answer denies the fraud set up by *Sleade* in his cross-bill. It admits the sale of the barge and its contents on or about the 4th of *February*, 1839, to *Sleade* by *Matlack* for the sum of 8,000 dollars, to be paid as set forth in *Sleade's* cross-bill, and says he sold as the agent of *Shaeffer*. The respondent admits that he told *Sleade*, at the time of the sale, that he was part owner of said property, believing it was proper for him to do so because he was verbally authorized by *Shaeffer* either to sell the property or to take an interest

in it; that immediately on effecting the sale he wrote to *Shaeffer* informing him of it, and asking him to ratify it and give to the purchaser a title, which *Shaeffer* did, whereby *Sleade* acquired a full and complete title to the property. He denies having represented to *Sleade* that there was no wax in the composition of the figures; he says he did not know himself what the composition was, and so stated to *Sleade;* and he further denies that he represented said figures as capable of enduring any degree of heat or cold, but said they would stand the heat or cold of the climate. He says that "the exhibition" was of great value; that large profits had been derived from it; and that he so stated in general terms, but not to defraud *Sleade*, &c. He denies having any interest in the suit, and prays to be dismissed, &c.

*Shaeffer*, by his answer, admits that *Matlack* was his agent and sold by his authority; that on being informed of the sale by *Matlack*, and being requested to ratify it, he came to *Louisville* to complete it in good faith; that he met *Sleade* who had had the possession of the figures about one month, and the contract was ratified, the bond given by *Matlack* for a title was taken up, and a complete title made by respondent to *Sleade*, who has retained the undisturbed possession of the property ever since. He further states that the original cost of the figures was about 6,000 dollars; that large profits had been derived from exhibiting them in various places; that they were of great value; and that he had been offered for the collection of figures real estate valued at 12,000 dollars; that "the exhibition" had yielded large profits to the respondent, and might also have yielded large profits to *Sleade* if it had been properly managed; that the figures were of a composition which neither the heat of summer nor the cold of winter would affect, &c. He denies that at the time he executed a title to *Sleade* for the property, he made any false or fraudulent representations as to its value or the profits derived from its exhibition, or of the composition of the figures; that *Sleade* having been in possession of them, and having exhibited them for more than a month, was fully aware of their composition and of its durability, and expressed no doubts about either to the respondent. He

denies that *Sleade* has placed himself in a condition to re-scind the contract, &c.

Replications were filed and a volume of testimony was taken. The cause was submitted to the Court on bill, answers, replications, exhibits, and depositions, and the Court decreed a rescission of the contract; the assignment of *Carr's* note and mortgage was set aside on the ground of fraud, and *Shaeffer* enjoined from further proceedings against *Sleade*, &c.

The decision of this case turns, we think, upon two questions; first, whether there were such false and fraudulent representations by *Matlack* as to the durability of the figures, and as to the profits derived from their exhibition, as to impose upon *Sleade* and induce him to make the contract set out in the bill; and, secondly, whether *Sleade*, within a reasonable time after he had an opportunity of discovering the imposition, returned or offered to return the property. To determine those questions we must advert to the testimony.

A witness, *Boyd*, deposes that about the 3d of *February*, 1839, he was on board of the barge containing the figures, and heard *Matlack* and *Sleade* in conversation about the purchase of the figures. In that conversation, *Sleade* inquired whether the figures were "well received," and what profits were derived from the exhibition of them. *Matlack* represented them as being well received and liberally patronized. Another witness, *A. P. Sleade*, a son of the defendant, states that he was present at the time the contract mentioned in the cross-bill was made; while the parties were contracting, *Sleade* inquired of *Matlack* whether the composition was not chiefly of wax? *Matlack* replied that wax formed no part of the composition; that it was of a superior kind that would not be affected by heat or cold. He further states, that while *Matlack* was trying to sell the figures, he represented the receipts arising from the exhibition of them at *Philadelphia* as averaging 300 dollars a day for nine months; that at *Pittsburg* they averaged from 75 to 100 dollars per day for two weeks; and that at *Cincinnati* between 1,000 and 2,000 dollars were received; that the profits of "the exhibition" would pay for the property in twelve months. The reason he gave for wishing to sell was, that he was afraid to risk his health during the summer season in a southern climate. A

third witness, *Warren*, who was employed as a hand on the boat, swears that he heard *Matlack*, at several times, speak of the receipts derived from the exhibition of the figures, and that he always exaggerated the amount received; that at *Cincinnati* they exhibited eleven days, and the receipts did not exceed 100 dollars. *W. P. Thomasson*, an attorney of *Louisville*, drew the contract between *Matlack* and *Sleade*, and he swears that before it was executed, *Matlack* represented to *Sleade* that wax formed no part of the figures. There is other testimony to the same effect, and there is much to show the extreme desire of *Matlack*, and other agents of the plaintiff, to sell the property even at a sum less than 3,000 dollars. The testimony also proves that the statements of *Matlack*, as to the favour with which " the exhibition" was received by the public, and the revenue derived from it, were extravagant and made to dupe the credulous and unsuspecting; and there is abundant proof upon the record that the figures, on being subjected to chemical analysis, were found to contain a large proportion of wax.

If this were a case in which the means of information relative to the value of the property sold had been equally accessible to both the parties, and they had dealt upon equal terms, a Court of equity would not interfere with the contract. Such however is not the fact. The value of the figures as a source of revenue was entirely unknown to *Sleade*, while on the other hand it was well known to the owners. It should not have been misrepresented. The value of the figures as such depended much, indeed entirely, on public favour and public patronage. Of the patronage bestowed, *Sleade* had no means of information except as he derived it from the plaintiff in error or his agents.

When a party to a contract places a known trust and confidence in the other party, and acts upon his opinion, any misrepresentation by the party confided in, in a material matter constituting an inducement or motive to the act of the other party, and by which an undue advantage is taken of him, is regarded as a fraud against which equity will relieve. *Laidlaw et al.* v. *Organ*, 2 Wheat. 178, 195.—*Evans* v. *Bicknell*, 6 Ves. 174, 182, 192.—*Phillips* v. *Duke of Bucks*, 1 Vern. 227.—1 Fonb. Eq. b. 1, c. 2, s. 8.

At law, an action may be maintained for false representations, made by a vendor to a purchaser, of matters within the peculiar knowledge of the vendor, whereby the purchaser is injured. As in the case of *Dobell* v. *Stevens*, the facts were that the defendant kept a public house, and was possessed of a lease of the house for a certain term of years, &c., and the plaintiff being in treaty with the defendant to purchase his interest in said house, the defendant falsely represented to the plaintiff that the receipts for the spirits sold in said house had been, and then amounted to, the sum of 160*l.* per month ; that the quantity of porter sold in the house amounted to seven butts per month ; that two rooms in the house rented for 27*l. per annum*, &c.; by means of which false representations, the plaintiff was induced to buy at and for a certain sum, &c. The Court decided that an action would lie, and adopted the language of Lord *Holt*, who had said in a former case that "if a vendor gives in a particular of the rents, and the vendee says he will trust him and inquire no further, but rely upon his particular, then if the particular be false an action will lie." 3 Barn. & Cress. 623.— *Lysney* v. *Selby*, 2 Ld. Raym. 1118.—3 Ves. & Beam. 108.

It is wholly immaterial in this case to inquire, whether *Matlack* intentionally misrepresented the amount of profits derived from exhibiting the figures or not, because if his misrepresentations were innocently made by mistake, they operated as a surprise and imposition on *Sleade*, as much as if they had been made through design. *Ainslie* v. *Medlycott*, 9 Ves. 21.—*Pearson* v. *Morgan*, 2 Bro. Ch. Rep. 388.—*Burrowes* v. *Lock*, 10 Ves. 470.

Although we are of opinion that an undue advantage was taken of *Sleade* by deceiving him in regard to matters which no vigilance on his part could detect, yet we think the contract cannot be rescinded. Applications to a Court of chancery for the exercise of its jurisdiction to rescind a contract are, it is true, addressed to the sound discretion of the Court ; but that discretion must be exercised by the Court, either in granting or refusing the relief prayed, in conformity with established principles. It is a rule of equity jurisprudence, that a contract will not in general be rescinded, where the contracting parties cannot be placed in the identical situation

which they occupied, and cannot be made to stand upon the same terms which existed when the contract was made. If the parties cannot be so placed, a Court will not rescind the contract, nor then, if the application to rescind be not made within a reasonable time.

It appears from the testimony in the case, that the sale was made by *Matlack* to *Sleade* on the 4th of *February*, 1839, and that *Sleade* took the figures immediately into his possession and conveyed them to *Louisville*, where he exhibited them until the 4th of *March* following, when the plaintiff in error ratified the contract made with him by *Matlack*, and gave him a title to the property. At the period last named, *Sleade* expressed no desire to rescind the contract. He continued to use and exhibit the property at *Louisville*, and *St. Louis*, and intermediate places, until in the month of *November* following, almost ten months after the date of the purchase, and not until then does he offer to return the property, or propose to rescind the contract. It furthermore appears, that the property cannot be restored in the same condition in which it was at the time of the contract, on account of some part of it being mutilated and disfigured by experiments made to ascertain the ingredients of which it was composed. Another reason why the contract should not be rescinded on the application of *Sleade* is, that he has rendered no account of the receipts during the time the figures were in his possession, nor are there any means of ascertaining satisfactorily what they amounted to. For these reasons a rescission of the contract cannot be decreed.

It is competent for this Court, under the circumstances, to render such a decree in the premises as the justice of the case requires. We are of opinion that a decree must be rendered in favour of *Shaeffer* for the value of the property, subject to such payments as *Sleade* has made. This part of the case is attended with some difficulty, as we have to arrive at the value amidst a mass of conflicting testimony. The admission of *Shaeffer* is that the original cost of the figures was 6,000 dollars. There is proof that he had been offered for them when they were new, and before they had been brought west of the mountains, at one time property valued at 12,000 dollars, at another time property valued at 7,000 dollars;

May Term, 1844.

that afterwards, while on the borders of this state, his agent had been offered for them and the barge in which they were deposited 2,500 dollars in cash, and some real estate the true value of which is not ascertained, but was probably about 2,000 dollars; that shortly before the last-mentioned offer, the barge and figures had been offered for 3,000 dollars; and one witness swears that the figures were worth about 2,800 dollars. With the foregoing proof before us, we have concluded to fix the value of the property sold at 4,500 dollars. *Sleade* has paid the sum of 2,000 dollars, for which he is entitled to a credit, and for the residue a decree must be entered in favour of *Shaeffer*.

*J. G. Marshall* and *R. Crawford*, for the plaintiff.

*S. C. Stevens*, for the defendants.