**O. C. PLYMALE, Laurajene Plymale and the Canan Company Relators, Inc., Defendants-Appellants,**

v.

**Joe UPRIGHT, Roy Case and Quality Homes Sales, Inc., Plaintiffs-Appellees.**

No. 2–680A188.

Court of Appeals of Indiana, First District.

April 21, 1981.

Perry W. Cross and P. Gregory Cross, Cross, Marshall, Schuck & DeWeese, P. C., Muncie, for defendants-appellants.

Michael J. Alexander, Alexander & Reed, Muncie, for plaintiffs-appellees.

NEAL, Presiding Judge.

## STATEMENT OF THE FACTS

Defendants-appellants O. C. and Laurajene Plymale and the Canan Company Realtors, Inc. (Canan Realtors) appeal a judgment entered upon a jury verdict in Delaware Superior Court No. 2, awarding plaintiffs-appellees Joe Upright, Roy Case, and Quality Homes Sale, Inc. $7,500 in damages for fraud.

We reverse.

## STATEMENT OF THE FACTS

The evidence most favorable to the judgment is as follows: O. C. and Laurajene Plymale own an unimproved lot located at 3801 North Virginia Avenue in the City of Muncie. In September of 1977 O. C. Plymale contacted Ed Canan of Canan Company regarding a listing. On September 23, O. C. Plymale signed a standard listing agreement; Vicki Huddleston, a Canan Company associate, signed on the company's behalf. The asking price was $6,250.

Joe Upright and Roy Case are the sole owners of Quality Motor Sales, Inc., d/b/a Quality Homes Sales, an Indiana corporation engaged in the business of selling mobile and modular homes in the City of Muncie. On October 3, 1977, Ricardo and Betty Diaz executed an agreement according to the terms of which they purchased a modular home for $29,350. At the time the agreement was signed, Quality Homes Sales owned a lot upon which the modular home was to be erected. However, it was later discovered county land use regulations prohibited the construction. In an effort to obtain a suitable replacement, the plaintiffs contacted Patti Taylor, a real estate agent associated with Canan Realtors, with whom they had previously dealt. Taylor brought the Plymales' property to the plaintiffs' attention.

On October 26, 1977, Upright executed a standard proposal to purchase the property. The plaintiffs offered $5,500. An earnest money deposit in the amount of $100 accompanied the offer. Taylor delivered the executed proposal to Huddleston; Huddleston conveyed its terms over the phone to the Plymales; the Plymales rejected the offer; Huddleston notified Taylor.

On October 27, Taylor informed Case the Plymales would accept only a full-price offer. Case executed a second standard proposal to purchase showing an offer of $6,250. The offer required acceptance on or before the end of the next day. The previous $100 earnest money deposit was carried over. It is not clear whether this offer was in fact tendered to the Plymales.

Later in the evening of October 27, Upright executed a third offer to purchase for $6,250, said offer open until the close of the next day. This offer was accompanied by a check in the amount of $6,150, which, when combined with the other $100, matched the full asking price.

On the morning of October 28, agents of the plaintiffs commenced bulldozing and

excavating operations on the Plymales' property. The Plymales' parents, whose residence is on an adjacent lot, notified them of the operations. O. C. Plymale called Ed Canan of Canan Realtors and informed him of the goings-on. In turn, Ed Canan contacted Upright and inquired whether it was indeed the plaintiffs who had entered upon the land. The report verified, Canan advised Upright that neither he nor Case was the owner of the property and that the property had been withdrawn from the market.

At approximately 5:00 p.m. the Plymales arrived at the offices of Canan Realtors where for the first time they were tendered and read the third offer. This offer was immediately rejected. O. C. Plymale testified that he and his wife were "upset" by the unauthorized excavation. The plaintiffs' money was returned a few days later.

The Diazes were informed the offer had not been accepted. The plaintiffs then had only ten days to obtain a lot and commence construction; otherwise, the Diazes would seek to cancel the contract. The plaintiffs apparently were unable to do so, and the modular home sale fell through.

The plaintiffs filed a complaint in the superior court. The cause was stated in two paragraphs, the first alleging breach of contract and the second alleging fraud; the plaintiffs sought $15,000 in compensatory damages for the expenses incurred and the loss of profits, and $30,000 in punitive damages. Following the close of the plaintiffs' evidence, the trial court granted the defendants' motion for judgment on the evidence, Ind.Rules of Procedure, Trial Rule 50, with regard to the first paragraph of the complaint, but denied the motion with regard to the second paragraph, alleging fraud. At the close of all the evidence defendants again moved for a judgment on the evidence, which was denied. The jury returned a verdict in favor of the plaintiffs awarding damages in the amount of $7,500. The defendants appeal the judgment.

## ISSUES

The defendants present the following issues for review:

"1. Whether the Trial Court committed error in overruling the defendants' Motion for Judgment on the Evidence made at the conclusion of the trial;

2. Whether there was sufficient evidence to sustain the verdict of the jury;

3. Whether the verdict of the jury was contrary to law;

4. Whether the trial court erred in overruling the defendants' objection and admitting into evidence testimony regarding plaintiffs' lost profits;

5. Whether the damages awarded to the plaintiffs by the jury were excessive."

Our determination on the first is dispositive of the appeal.

## DISCUSSION

In *Daly v. Showers*, (1937) 104 Ind.App. 480, 485–486, 8 N.E.2d 139, the Appellate Court turned to 26 C.J.S. *Fraud* § 1 (1921), p. 1059, for the following comment on the general nature of fraud:

" 'Fraud in its generic sense, especially as the word is used in courts of equity, comprises all acts, omissions, and concealments involving a breach of legal or equitable duty and resulting in damage to another. Fraud has also been defined as any cunning or artifice used to cheat or deceive another. However, the wisdom of an exact legal definition of fraud has been questioned, and it has been stated that fraud is better left undefined, and some courts have said that the common law not only fails to define fraud but perhaps asserts as a principle that there shall be no definition. *Further it is frequently stated that owing to the multiform character of fraud and the great variety of attendant circumstances no definition which is all inclusive can be framed, but each case must be determined on its particular facts.*' " (Emphasis added.)

Notwithstanding the lack of an exact legal definition, the elements of a cause of action in fraud are well established: To sustain an action for fraud it must be proven by a preponderance of the evidence that a material representation of a past or existing fact was made which was untrue and known to be untrue by the party making it, or else recklessly made, and that another party did in fact rely on the representation and was induced thereby to act to his detriment. *Fleetwood Corporation v. Mirich*, (1980) Ind. App., 404 N.E.2d 38; *Gonderman v. State Exchange Bank, Roann*, (1975) 166 Ind.App. 181, 334 N.E.2d 724; *Plumley v. Stanelle*, (1974) 160 Ind.App. 271, 311 N.E.2d 626; *Soft Water Utilities, Inc. v. Le Fevre*, (1974) 159 Ind.App. 529, 308 N.E.2d 395; *Grissom v. Moran*, (1972) 154 Ind.App. 419, 290 N.E.2d 119; *Middelkamp v. Hanewich*, (1970) 147 Ind.App. 561, 263 N.E.2d 189. Fraud need not be proven by direct or positive evidence; it may be proven by circumstantial evidence, provided there are facts from which the existence of all the elements can be reasonably inferred. *Gonderman, supra; Grissom, supra; Middelkamp, supra.*

■ In the case at bar the defendants moved for a judgment on the evidence at the close of all the evidence. T.R. 50. The motion was denied and the cause was submitted to the jury. A motion for judgment on the evidence at the conclusion of all the evidence may be granted only if there is no substantial evidence or reasonable inference to be adduced therefrom to support an essential element of the claim. If there is or if reasonable persons might differ, judg-

ment on the evidence is improper. *Keck v. Kerbs*, (1979) Ind.App., 395 N.E.2d 845.[1]

■ On appeal the defendants argue the plaintiffs failed to allege or show the defendants made a material misrepresentation of fact upon which they justifiably relied to their detriment. In the second paragraph of their complaint the plaintiffs alleged:

"2. That Defendants offered to sell their property ... and know or reasonably should have known said offer to be false and that in truth and fact Defendants would not complete the sale of said property to Plaintiffs; ..."

The complaint indeed fails to state a cause of action in fraud for the reason the representation upon which the fraud is predicated is not a representation of existing facts, but at most a promise to be performed in the future. *Middelkamp, supra.* At trial, however, the parties presented a great deal of conflicting evidence concerning statements Patti Taylor made during the course of the negotiations. The plaintiffs based their cause of action upon Taylor's misrepresentation that they owned the property and could begin construction.[2]

■ Whether certain statements were made as asserted is on conflicting evidence a question of fact for the jury. Whether the plaintiffs acted in reliance upon the defendants' representation and whether the plaintiffs were justified in so doing are also on conflicting evidence questions of fact for the jury. 37 C.J.S. *Fraud* § 129. However, when the form of the statements and the subject matter regarding which, or the circumstances in which they were made are

1. "The general rule that questions of fact are to be determined by the jury and questions of law by the court applies in an action for fraud. Thus, if there is proof as to all of the essential elements of fraud, and the evidence is conflicting, the question of fraud is one of fact for the jury, under proper instructions from the court as to what constitutes fraud, or for the court sitting as the trier of facts. On the other hand, the issue of fraud should not be submitted to the jury where the facts are undisputed and are susceptible of only one reasonable conclusion, or where there is a failure of proof as to an essential element of fraud. Thus, where there is a failure of

proof as to an essential element of fraud, it is proper for the court to ... direct a verdict for defendant, according to the practice prevailing in the particular jurisdiction." (Footnotes omitted.)
37 C.J.S. *Fraud* § 123 (1943), pp. 448–450.

2. In their brief the plaintiffs state:
"It is clear that the element of material misrepresentation of the existing fact of ownership and right of the Plaintiffs to immediate possession on payment by the Plaintiffs of the full purchase price to Defendants were made by Defendants."

such that the statements cannot be construed as anything but an expression of opinion or belief, or a representation of law, it is proper for the court to so find and to refuse to submit the cause to the jury. 37 C.J.S. *Fraud* §§ 55, 124.

### Reliance

As noted at the opening of the discussion, reliance upon a misrepresentation is a material element of a cause of action in fraud. In *Frenzel v. Miller*, (1871) 37 Ind. 1, 17, the Supreme Court stated:

> "To constitute a misrepresentation a ground of fraud [sic] for avoiding the contract, or to entitle the injured party to his action, it must be in regard to a material fact, operating as an inducement to the purchase or the making of the contract, *and upon which the purchaser or person making the contract had a clear right to rely; and the party complaining must have been actually deceived thereby*; and generally, such representation must not be mere matter of opinion, or in respect of facts equally open to the observation of both parties, and concerning which the party complaining, had he exercised ordinary prudence, could have attained correct knowledge. If a party blindly trusts, where he should not, and closes his eyes, where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies *volenti non fit injuria*." (Emphasis added.)

As indicated by our emphasis, the element consists of two distinct parts: the fact of reliance [3] and the right of reliance.[4] The fact of reliance is by far the easier to determine. In *Security Trust Company v. O'Hair*, (1935) 103 Ind.App. 56, 61, 197 N.E. 694, the Supreme Court stated:

> "[W]hen both parties are dealing at arm's length and one party, in spite of the facts well known to him, deliberately ignores such facts and chooses to believe statements to the contrary, he closes his eyes to the truth and deliberately takes a chance. It then cannot be said that he was injured in law. All that can be said is that he gambled and lost."

**3.** The fact of reliance is described in 37 C.J.S. *Fraud* § 29, pp. 270–271, as follows:

"There can be no redress for representations which do not influence complainant, because such representations cause no damage. Thus the hearer cannot secure redress for representations, where he failed to rely thereon because of their trivial character, because he was informed of the real facts and so could not be deceived thereby, ... because he relied solely on information obtained from other sources, or because he relied solely on a guaranty.

\* \* \* \* \* \*

*Test of reliance.* It is generally held that whether the party would have acted in the absence of the representation is the test of whether or not he relied thereon that to secure redress for false representation complainant must show that he would not have acted but for such representation; and that there can be no recovery for concealment where it does not appear that plaintiff would have acted otherwise had he known the facts; but that, if complainant was so influenced by misrepresentations that without them he would not have acted, sufficient reliance is shown to warrant recovery. A few decisions, however, have repudiated this test as too speculative, and have held that it is sufficient that the representations have operated as one of the inducements to plaintiff's actions." (Footnotes omitted.)

**4.** The right of reliance is described in 37 C.J.S. *Fraud* § 30, pp. 272–273, as follows:

"In many decisions it is enunciated as a general rule that representations are not actionable unless the hearer was justified in relying thereon in the exercise of common prudence and diligence. It is recognized, however, that there are limitations to this rule, and it would seem that whether or not there is a right to rely on representations in any particular case, what constitutes reasonable prudence and diligence with respect to such reliance, and what conduct constitutes a reckless or conscious failure to exercise such prudence, will depend on the various circumstances involved. In this respect, the factors which may be controlling are the form of the representations, ... their materiality, ... the relation of the parties, ... the respective knowledge and means of knowledge of the parties, ... and the party to whom the representations were made.... So the respective character, intelligence, experience, age, and mental and physical condition of the parties are considerations which may vary the rule as to diligence or render it of small importance." (Footnotes omitted.)

See *Craig v. Hamilton*, (1889) 118 Ind. 565, 21 N.E. 315.[5]

■ The right of reliance is more difficult to determine for the reason it is tightly bound up with the duty of a representee to be diligent in safeguarding his interests. The legal obligation that a person exercise the common sense and judgment of which he is possessed is a practical limitation on the actionability of various representations. In the course of daily interaction and business dealing the average person encounters a barrage of opinions, advice, advertisements, estimates, and even "guestimates." He simply cannot believe, or rely upon, everything he is told. "The design of the law is to protect the weak and credulous from the wiles and strategems of the artful and cunning, as well as those whose vigilance and sagacity enable them to protect themselves." *McKee v. State*, (1887) 111 Ind. 378, 381, 12 N.E. 510. However, it is also settled that where persons stand mentally on equal footing, and in no fiduciary relation, the law will not protect one who fails to exercise common sense and judgment. *Gatling v. Newell*, (1857) 9 Ind. 572.

■ Common sense dictates, and our system of jurisprudence requires the application of a principle, that parties engaged in the negotiation of a contract or the sale and purchase of property be obligated to protect their interest by reading the attendant documents before signing. In *Robinson v. Glass*, (1883) 94 Ind. 211, 212, the Supreme Court stated:

"A man who can read and does not read an instrument which he signs is, as a general rule, guilty of negligence, and so he is, if, being unable to read, he neglects to exercise ordinary prudence in requiring the instrument to be read to him."

See *Consolidated Garage & Sales Co. v. Dilts*, (1923) 79 Ind.App. 287, 137 N.E. 771; *Wood v. Wack*, (1903) 31 Ind.App. 252, 67 N.E. 562. The principle is applied to discourage reliance upon representations which are made by parties with conflicting interests regarding the character or content of the document being signed. Of course, if the courts were to apply the principle strictly, the fraudfeasor would too often prevail. Thus, the principle is not applied in those cases where a party is by trickery prevented from reading the document or by trust and confidence lulled into believing another's representation as to its character or content. In *Robinson, supra*, 94 Ind. at 214, the court commented:

"We have stated the general rule to be that one who signs an instrument must read it, or have it read to him, and have said that the rule does not operate where a trick or artifice is resorted to for the purpose of preventing the person from reading the instrument. We are now to consider what may be deemed such a trick or artifice. Ordinarily, one contracting party has no right to rely upon the statements of the other as to the character or contents of a written instrument (this, indeed, is only another form of stating the general rule); but while this is true, it is also true that if a known trust and confidence is reposed in the person making the representations, and there is a relationship justifying such trust and confidence, then the person to whom the representations are made may rely upon them. *Shaeffer v. Sleade*, 7 Blackf. 178; *Peter v. Wright*, 6 Ind. 183; *Bischof v. Coffelt*, 6 Ind. 23; *Matlock v. Todd*, 19 Ind. 130; *Worley v. Moore*, 77 Ind. 567; 2 Parsons Cont. (7th ed.) 774."

More recently stated in *Le Fevre, supra*, 159 Ind.App. at 536–37, 308 N.E.2d 395:

"The person relying on the representations is bound to use ordinary care and diligence to guard against fraud; however, the requirement of reasonable prudence in business transactions is not carried to the extent that the law will ignore an intentional fraud practiced on the unwary. *Grissom v. Moran, supra*. A person has a *right to rely* upon representations *where the exercise of reasonable prudence does not dictate otherwise*. *Voorhees v. Cragun* (1916), 61 Ind.App. 690, 112 N.E. 826." (Emphasis added.)

*Smart & Perry Ford Sales, Inc. v. Weaver*, (1971) 149 Ind.App. 693, 274 N.E.2d 718.

5. Some Indiana decisions refer to the fact of reliance as *deception*. See *Plumely, supra*;

*See Fleetwood, supra.* Of course, whether a person has exercised reasonable prudence, i. e. whether the reliance was justified, is on conflicting evidence a matter for the jury to determine.[6]

*Misrepresentation*

■ As noted at the opening of the discussion, misrepresentation is a material element of fraud. The plaintiffs must prove by a preponderance of the evidence that a representation was in fact made and that the representation was of actionable character, i. e. a representation as to existing facts and not a mere expression of opinion.

"The general rule is that the mere expression of opinion or belief, or, more precisely, a representation which is expressed and understood as nothing more than a statement of opinion, cannot constitute fraud. To be actionable, a false representation must be one of fact as distinguished from an expression of opinion, which ordinarily is not presumed to deceive or mislead, or to influence the judgment of the hearer, and on which he has no right to rely, since he is assumed to be equally able to form his own opinion." (Footnotes omitted.)

37 C.J.S. *Fraud* § 10, pp. 226–227.

■ Whether a given representation is an expression of opinion or a statement of fact depends on the particular facts and circumstances of the case. The relation of the parties, the form and subject matter of the representation, and the opinionative quality of the representation are all relevant to the determination. In many cases,

the question of whether the representation is actionable is subsumed by the question of the right of reliance and thereby becomes a matter for the jury. However, the authorities clearly allow the courts, when confronted with representations which are simply not the stuff that fraud is made of, to find as a matter of law either that the representations are not actionable or that the plaintiffs had no right to rely as a matter of law.

"*Representation of fact or opinion.* When the form of a statement, and the subject matter or the circumstances under which it was made, are such that it cannot fairly be construed as anything but an expression of opinion or belief, it is proper for the court so to hold, and to refuse to submit the question to the jury . . . ." (Footnotes omitted.)

37 C.J.S. *Fraud* § 124, p. 452.

"*Right to rely.* Where the evidence is so clear as to be susceptible of only one reasonable inference, it is for the court to determine as a matter of law whether plaintiff was justified in relying on the representation and whether he was negligent in doing so." (Footnote omitted.)

37 C.J.S. *Fraud* § 129, p. 455. Essentially, these findings are the same.

There are a number of Indiana cases in which the courts have determined certain representations to be inactionable as a matter of law, or, reliance on certain types of representations to be unjustifiable as a matter of law. These cases involve representations of law,[7] or, more particularly,

---

**6.** In 37 C.J.S. *Fraud* § 129, pp. 455–456, it is stated:

"*Right to rely.* Where the evidence is so clear as to be susceptible of only one reasonable inference, it is for the court to determine as a matter of law whether plaintiff was justified in relying on the representation and whether he was negligent in doing so. Generally, however, it is for the jury to determine as a question of fact whether on all the facts in evidence plaintiff was justified in relying on defendant's statements, whether the representations were of such a character and were made under such circumstances that they were likely to deceive plaintiff, whether plaintiff could by ordinary diligence have discovered their falsity, and whether plaintiff

was negligent in relying on the representations and in failing to make an independent investigation of the facts."

**7.** 37 C.J.S. *Fraud* § 55, pp. 323–325 states:

"It is a generally accepted principle that a misrepresentation as to a matter of law or that a concealment as to a matter of law will not constitute remediable fraud, even though such misrepresentation is believed and acted on. Some authorities state, as the reason for the rule, that *every one is presumed, or bound, to know the law* and, therefore, cannot, in legal contemplation, be deceived by erroneous statements of law; but this reasoning has been criticized. By some decisions the rule is based on the ground that a

representations as to the legal effect of an instrument. In *Clem v. New Castle and Danville Railroad Company*, (1857) 9 Ind. 488, 489, the Supreme Court stated:

> "As a general rule, a party who has been induced to execute an agreement, by reason of the fraudulent representations of the other party, may set up such representations in bar of an action on the agreement. But this rule is subject to various exceptions; and one of them occurs when the representations, though false, relate to the legal effect of the instrument sued on. *Every person is presumed to know the contents of the agreement which he signs, and has, therefore, no right to rely on the statements of the other party as to its legal effect."* (Emphasis added.)

In *Platt v. Scott*, (1843) 6 Blackf. 389, the Supreme Court stated as the reason for the rule that everyone is presumed to know the law. Platt sued Scott on two promissory notes executed by the latter to the former in January of 1840; Scott defended the notes were obtained by fraud. The evidence showed the notes were given in partial payment for a land warrant issued by the United States Secretary of War. The land warrant awarded 320 acres to one Hall who had sold the warrant to Platt. There was evidence to show Platt represented to Scott the warrant could be located on any land in the Indiana territory. The representation was consistent with the 1816 act of Congress under which the warrant was issued. However, an 1818 act limited the location of the warrant to federal lands within the state which had been previously offered for sale. The court considered the statements to be representations of the legal effect of the warrant, and held:

> "It is considered that every person is acquainted with the law, both civil and criminal, and no one can, therefore, complain of the misrepresentations of another respecting it. In the case before us, the defendant must be presumed to have

statement of law is *merely the expression of an opinion*, and that the hearer has no right to rely on such a statement, since all parties

known the law regulating the location of the warrant in question; and he cannot, therefore, be permitted to say that he was misled by the representations which the plaintiff made as to what the law was on the subject." (Emphasis added.)

6 Ind. at 390–391. *See Russell v. Branham,* (1846) 8 Blackf. 277.

In *Clem, supra,* the court stated as the reason for the rule that the legal effect of an instrument is merely an opinion. Clem signed an agreement dated August, 1954, which provided:

> " 'We, the undersigned, agree to pay 50 dollars to the president and directors of the *Newcastle and Danville Railroad Company,* for each share of stock annexed to our names, subject to the assessment of the board of directors, not exceeding 5 per cent. of the amount subscribed every sixty days. No assessment except 1 per cent. to be made until the subscription to the capital stock of the road amounts to 600,000 dollars. These subscriptions are made on the condition that the road runs through, or within a half mile of, the original plat of *Covington, Fountain* county, *Indiana.* One per cent. due on subscribing, or on demand.' "

9 Ind. at 488. Under the terms of the agreement, Clem purchased ten shares. In April of 1855 the board of directors ordered payment of the first assessment on May 15 and payments of five percent each and every 60 days thereafter. Against a claim for arrearages Clem defended that an agent of the railroad had represented there would be no calls until roads in a certain county were fully laid out, and that said task had not yet been accomplished. The court held:

> "Here, the agreement is sufficiently explicit. It says that no assessments shall be made until the subscription to the capital stock amounts to 600,000 dollars; hence the agent's statement that defendant would not be called on to pay until the road was laid out and worked on in Warren county, could have been nothing

have equal opportunity to find the law." (Footnotes omitted, Emphasis added.)

*more than a mere expression of opinion; and though intended to deceive the defendant, it was not, in point of law, adequate to that purpose;* because the instrument to which he signed his name authorized the company to make and collect assessments at any time after a certain amount of capital stock was subscribed. (Emphasis added.)

9 Ind. at 489.

In *Smither v. Calvert,* (1873) 44 Ind. 242, two real estate agents in Indianapolis represented to a purchaser he was receiving a general warranty deed when in fact he was receiving only a limited warranty, or quit-claim, deed. The plaintiff sued to recover the $2,000 he had paid for the land. The Supreme Court stated:

> "As to the part of the first paragraph relating to the character of the deed, we think there can be no doubt. As we have seen, the deed was a warranty deed, although not a deed of general warranty. It is alleged, in substance, that the plaintiffs stated, when the deed was offered to them, that it was not such a deed as they were entitled to receive, and that they afterward received it upon the representation of one of the agents of the defendant that it was a warranty deed and all the kind of deed required in the State of Iowa to convey lands. We think fraud cannot be predicated upon such a representation. It was such a deed, no doubt, as would convey lands in Iowa. *It was not a general warranty deed, and the plaintiffs knew it was not. It showed upon its face just what it was.* The plaintiffs had only to read it to learn that it was not a general warranty deed.... It seems to be settled that a representation with reference to the legal effect of a written instrument cannot be fraudulent in a legal sense." (Emphasis added.)

44 Ind. at 246. *See generally Clodfelter v. Hulett,* (1880) 72 Ind. 137; *Dutton v. Clapper,* (1876) 53 Ind. 276; *President and Trustees of Hartsville University v. Hamilton,* (1870) 34 Ind. 506; *Reed v. Sidener,* (1869) 32 Ind. 373; *Mears v. Graham,* (1846) 8 Blackf. 144; *Gipe v. Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co.,* (1907) 41 Ind.App. 156, 82 N.E. 471.

Returning to the facts in the case at bar, we note the first standard proposal to purchase, executed by Joe Upright, offered $5,500 and was accompanied by a $100 earnest money deposit. Upright does not allege he did not have an opportunity to read the document. He does not allege he was unaware of its character or content, or he was induced to execute the instrument by a misrepresentation of facts. The offer to purchase read as follows:

"Muncie Board of Realtors, Inc.

STANDARD PROPOSAL TO PURCHASE

I/WE hereby agree to purchase through ...The Canan Co. Realtors, Inc................. as agent, the property, and appurtenances thereto, known as 3801 N. Virginia...... in the City of .Muncie. County of .Delaware.. State of .Indiana.... and more fully described as being ...Lanewood Addition, Section 13,.......... ...Lot # 94............................... The price of said property to be .. $5,500.00.... and I/WE will pay for same in the following manner: .$ cash..., to be paid in cash upon the closing of the transaction and the transfer of said real estate, the balance as follows, to wit: ..——............................. .............................................. .............................................. The owner of the above described property shall and does agree in accepting this proposition to furnish, on or before the passing of title from the seller to the buyer, an abstract to said real estate, which abstract shall be certified to date and disclose the title to be good and merchantable and free and clear of all debts, liens, and encumbrances except as noted herein, and upon the fulfillment of the terms and conditions as set forth in this proposition, shall and will convey said property to said purchaser or his assigns by good and sufficient General Warranty Deed or customary 'Contract Purchase Agreement' signed by any and all persons having an interest in same. It is part of this agreement that the transaction shall be closed as quickly as all necessary papers can be prepared, examined and ready for execution.

Remarks: ...lot size.– approx. 79' x 141'....... .............................................. I/WE will assume the taxes due and payable in ..Spring 1978 (Spring 1977 taxes).......... Possession to be given .immediately upon closing

I/WE hand you herewith the sum of . $100.00. as earnest money to be retained in escrow until the closing of the transaction, to apply upon purchase price of said property, which sum is to

be returned to me, if said owner, mentioned herein, does not accept my proposition.

As part of the consideration in this agreement it is further understood that if this offer is accepted and I/WE fail to complete the purchase of said real estate herein mentioned as herein provided, within ..30.. days from acceptance as aforesaid, the amount of said deposit of ..$100.00. shall be forfeited.

All interest, insurance and rents shall be pro rated to date of conveyance and settlement made accordingly.

The terms and conditions of this agreement shall extend to and be binding upon the heirs, personal representatives, successors, and assigns of the respective parties hereto.

This proposition to be binding on me/us must be accepted on or before the ..29th.. day of ..October......., 1977.

It is expressly agreed that all terms and conditions are included herein and no verbal agreements of any kind shall be binding or recognized.

I/WE acknowledge that The Canan Co. is an agent for the owner of the above-described property and that it has a large staff of sales personnel and also is a member of a multiple listing service, and therefore other Realtors may be involved in offering the same real estate for sale by its sales personnel. I/WE further acknowledge that by reason of the foregoing there may be a number of proposals submitted to the owner and that I/WE acknowledge and agree that the owner has the sole right to decide whether or not to accept or reject this proposal and that he may make said decision without regard to whether or not this proposal is submitted prior to, simultaneously with, or following submission of other proposals and that as such owner he solely decides which proposal is to be accepted and that I/WE will not hold The Canan Co. nor any of its sales personnel responsible for the decision of the owner.

Signed by me/us this .26th. day of .October, 1977.

Signed, ...Joe Upright..........
Signed, ......................

As owner of the property described in the annexed proposition, I/WE hereby agree to and do accept said proposition and will comply with all terms and conditions set forth therein; and I/WE also agree to pay to .................. the sum of $......................... for their services in procuring purchaser for the within described real estate. I also agree that the sum of $........ as earnest money, is to be

retained by Realtor and held in escrow until the closing of the transaction. Also, I agree that the earnest money is to apply on Realtors Brokerage Fee and to apply on the purchase price of said property.

I/WE further agree, in accepting this proposition that, in the event said purchase ........ herein mentioned fail ........ to complete as agent shall retain its full Brokerage Fee on the accepted purchase price, from the forfeited faith payment paying the balance of said faith payment to me.

Signed by me/us this ....... day of ......., 19...

Signed........................
Signed........................"

Both Upright and Roy Case admit they were aware this offer had been rejected. Patti Taylor testified she advised Case the Plymales would not accept less than a full price offer. Case asserted Taylor gave him the impression if he offered the full price he could purchase the property. Case testified Taylor came to the company offices at which time he told her he intended to buy the property and he had to have immediate possession. He asked her if he could trust her to get him a deed and abstract prior to his closing on the house, which was to occur the next week. Case then executed the second standard proposal, offering $6,250 with the same $100 earnest money deposit. At trial Case did not allege he did not have an opportunity to read the offer to purchase. He did not allege he was unaware of its general character and content. He testified that although he was familiar with the Muncie Board of Realtors' standard proposal form, he had never thoroughly read its terms, and did not see fit to do so on this occasion. Sometime during the afternoon, Case went to the appropriate public offices and secured building permits.

It appears that later in the day Taylor spoke with Upright by telephone. Due to the urgency of the situation with regard to the defendants' contract to build the Diazes' home within a very few days it was decided the plaintiffs would execute a third proposal, offering the full listing price and being accompanied by two checks in the amount of $100 and $6,150. Taylor testified this

was done in order to encourage acceptance of the plaintiffs' offer ahead of any possible others; she asserted she made no statements regarding ownership at that time. Upright testified:

"Q. Concerning the phone call that you got from Patti Taylor, you said that she called and told you they needed the full amount of money, is that correct?

A. Yes.

Q. If you were gonna start work tomorrow?

A. Yes.

Q. Did she say anything else about that?

A. Just that they needed all the money since we had bought the lot, since we had paid the asking price for the lot."

Later that evening Taylor and her husband arrived at the plaintiffs' offices with the third proposal. Upright, Case and the Diazes were present. Upright executed the third standard proposal to purchase, offering $6,250 without an earnest money deposit. The proposal clearly indicated it was an offer for the full price and was submitted along with checks totaling the full price (possession upon closing).

There is a considerable amount of conflicting testimony regarding the statements Taylor made at the meeting to Upright, Case and the Diazes regarding ownership and possession. Taylor testified she made absolutely no representation regarding ownership at that time; to have done so, she argued, would have been ludicrous since the plaintiffs were at that moment tendering an offer to purchase. She was equivocal about statements she possibly made to the effect that she would, or the plaintiffs could, "get started right away." Upright testified:

"A. Uh and that was about it. Then they get ready to leave, they were in a hurry, and they took the professor's hand and also his wife and congratulated them, on their purchase of their lot where they're were gonna put their home.

Q. Anything else said?

A. No sir.

Q. Okay. Was anything said about a closing?

A. No."

Case testified:

"Q. Okay. At that time, did she explain to you why you needed to pay the money in full?

A. Uh, said if we were gonna take immediate possession and I had to go to work right away, she had to have all the money.

Q. What did you tell her about that?

A. That I explicitly said I'm gonna do it, and I'm gonna depend on you, which she had done it before, you get me a deed and a, the abstract of title, and bring it up to date, and I such and such date [sic]. And she said, said fine. And I did explain to her that I was going to work the next day.

\*   \*   \*   \*   \*   \*

Q. Yes sir. You were present in Court when she testified about her version of that conversation, if she said congratulations on the home, she was talking about the blue prints and not the lot because they didn't buy the lot?

A. We were very explicit about the lot also so.

Q. You were very . . .

A. Very explicit."

## DECISION

■ In the case at bar the plaintiffs claimed the defendants fraudulently misrepresented the plaintiffs owned the land, in reliance on that misrepresentation the plaintiffs entered upon the land, began construction, but were then removed, and as a result the plaintiffs incurred operating expenses and were rendered incapable of fulfilling their obligations under the terms of a contract with a third party. We are of the opinion the plaintiffs failed to present

substantial evidence to support either the element of material misrepresentation or the right of reliance.

It is undisputed Upright and Case knew the Plymales were the owners of the property and Canan Realtors was their agent in soliciting offers. Upright and Case had been in the construction business for a number of years and had engaged in numerous real estate transactions. They testified they were familiar with deeds, abstracts, and offers to purchase, in general. Although their testimony is somewhat confusing, upon review we are not of the opinion the plaintiffs believed they could become the owners of the property without executing any instruments whatsoever. Rather, it appears their understanding of the legal effect of the instruments they signed was influenced by statements which Taylor made during the course of negotiations.

Case testified as follows:

"Q. It was your judgment was it that when you paid the six thousand two hundred and fifty dollars to the Canan Company, that you bought the lot?

A. That's right.

Q. Even if you had paper work to the contrary, that was still your opinion?

A. I was going on the judgment of her character, of what we had had business before, and we both understood that.

\* \* \* \* \* \*

Q. You knew that that was a proposal, did you not?

A. Right.

Q. You knew that it (inaudible) about real estate you signed one of those did you not?

A. I signed it with the expectations that I owned the real estate."

As noted earlier on, whether certain statements were made as asserted on conflicting evidence is a question for the jury to determine. Needless to say, we find substantial conflicting evidence. However, viewing the evidence in a light most favorable to the judgment, thus assuming Taylor made the alleged statements regarding ownership and right of possession, we are of the opinion that the plaintiffs failed to show the representation was actionable.

The evidence clearly shows the plaintiffs were well aware of the material facts underlying the transaction and the instruments they executed certainly indicated the status of the transaction. The plaintiffs were aware the Plymales were the owners; the proposal to purchase required the owners' written acceptance whether the offer was for an amount less than, equal to, or more than the listing price. In short the plaintiffs knew as much about the facts of the underlying transaction as Taylor. Although we will not ignore an intentional fraud practiced on the unwary, we will, in most cases, require the exercise of reasonable prudence in business transactions by professionals who are dealing at arm's length. Thus we are constrained to hold that the essential representation cannot be construed as anything but a representation as to the legal effect of an instrument, i. e. a mere opinion, and as such, the representation is inactionable, i. e. the plaintiffs had no right to rely upon it as a matter of law. The trial court erred in denying the defendants' motion for judgment on the evidence.

For the reasons stated above, the judgment is reversed.

Reversed.

ROBERTSON and RATLIFF, JJ., concur.