Thomas G. ALLEN, Joe M. Gilstrap, Thomas G. Grier, James H. Nelson, Donald K. Owens, Richard K. Patierno, Richard K. Patierno, Jr., Silvine M. Patierno, and John M. Stone, Appellants–Plaintiffs,

v.

GREAT AMERICAN RESERVE INSURANCE COMPANY, and Glenn H. Guffey, Appellees–Defendants.

No. 29A05–0003–CV–95.

Court of Appeals of Indiana.

Nov. 29, 2000.

George M. Plews, Jeffrey A. Townsend, Plews Shadley Racher & Braun, Indianapolis, IN, Attorneys for Appellants.

Joseph H. Yeager, Jr., Michael J. Valaik, Indianapolis, IN, Attorneys for Appellee Great American Reserve Insurance Company.

Patricia Polis McCrory, Mark W. Pfeiffer, Harrison & Moberly, Indianapolis, IN, Attorneys for Appellee Glenn H. Cuffey.

**OPINION**

BAKER, Judge

Appellants-plaintiffs Thomas G. Allen, Joe M. Gilstrap, Thomas G. Grier, James H. Nelson, Donald K. Owens, Richard K. Patierno, Richard K. Patierno, Jr., Silvine M. Patierno, and John M. Stone ("Subagents") appeal the trial court's grant of partial summary judgment in favor of appellees-defendants Great American Reserve Insurance Company ("GARCO") and Glenn H. Guffey. Specifically, they contend that 1) the Indiana Journey's Account statute preserves each Count of their amended complaint; 2) the trial court erroneously applied South Carolina law to a dispute that should have been governed by Indiana law; and 3) the trial court improperly determined that the Subagents unreasonably relied on Guffey's misrepresentations.

*FACTS*

The facts most favorable to the Subagents show that they sold a tax-deferred

annuity called the "Flex II" primarily in the state of South Carolina. The Subagents contracted to work for Jefferson National Life ("JNL") under Guffey who was their general agent. JNL later merged with GARCO, an insurance company headquartered in Noblesville, Indiana, which became JNL's corporate successor.[1] Contracts between the Subagents and GARCO specified: "Venue for any action between the parties arising under this agreement shall be in Noblesville, Hamilton County, Indiana." Record at 1223–25. As a general agent, Guffey trained the Subagents how to sell the Flex II. Part of his instruction included telling the Subagents that the Flex II had *no front-end load,* which means that no commission or other fees were taken out of premiums paid in the initial years of the policy.

The Flex II policy, however, stated that the "percentage of each premium which will be accumulated at interest to determine the cash value" was 65% in the first year and 87.5% for years two through five for a policyholder under age 59. R. at 1193. Thus, the policy language revealed a front-end load fee. The policy statement also illustrated the cash value of the annuity over a period of forty years, revealing that the cash value was less than the premium paid for at least the first six years of the policy's life. The illustration, which assumes that $1000 is paid on the first day of each policy year, showed in part:

| End of Policy Year | GUARANTEED CASH VALUES ISSUE AGE 59 and under |
|---|---|
| 1 | $ 676.00 |
| 2 | 1,613.04 |
| 3 | 2,587.56 |
| 4 | 3,601.06 |
| 5 | 4,655.11 |
| 6 | 5,881.31 |
| 7 | 7,156.56 |

R. at 1193.

To be licensed to sell insurance in South Carolina, the Subagents took a course that taught them to review the policies they sold. R. at 1373. However, the Subagents never read or reviewed the Flex II before selling it (R. at 203, 512, 555, 615, 646, 751, 844, 905) even though Guffey gave them copies of the policy or allowed them access to his office where a copy was kept. R. at 325, 330, 346, 354, 359, 368, 415. The Subagents sold these policies to thousands of customers, representing that the Flex II bore no front-end load. R. at 60. When the Subagents sold the Flex II, they required each customer to sign a document titled "Memorandum of Understanding Tax Sheltered Annuity." R. at 983. The Memorandum recited that the policy had been explained to the customer and that the customer understood how the "values accumulate[d] under th[e] policy." R. at 983.

After some of the customers complained about misrepresentations related to the sale of the Flex II, the South Carolina Department of Insurance launched an investigation. As a result of the investigation, most of the Subagents entered into consent decrees with the department admitting that they had misrepresented the Flex II. GARCO paid for fines that the Department imposed on the Subagents.

On June 19, 1995, the Subagents initiated suit against Guffey and GARCO in a South Carolina federal district court, claiming, *inter alia,* violations of the South Carolina Unfair Practices Act, civil conspiracy, and fraud. The federal district court subsequently dismissed the suit without prejudice because of improper venue and lack of diversity among the parties. The Subagents then initiated suit in Indiana on September 16, 1997. Three weeks later, the Subagents filed an amended complaint, setting forth twelve counts against Guffey and GARCO.[2] Both Guffey

---

1. Pursuant to the December 31, 1994 merger between GARCO and JNL, GARCO assumed JNL's liabilities. R. at 27. The Subagents

sold both GARCO and JNL insurance products.

2. The twelve counts are as follows: (1) Breach of Contract Accompanied by Fraudu-

and GARCO moved for partial summary judgment on the first eleven counts in the complaint. Pursuant to Ind. Trial Rules 54(B)[3] and 56(C), the trial court granted partial summary judgment in favor of Guffey and GARCO on the first eleven counts. The trial court also concluded that Counts III–V and Count X of the Subagents' complaint, which were added by the amended complaint, were barred by the statute of limitations and could not be saved by the Indiana Journey's Account statute. The Subagents now appeal.

## DISCUSSION AND DECISION

### I. Standard of Review

When reviewing a grant of summary judgment, this court applies a well-settled standard of review. A trial court properly grants summary judgment when the "designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." T.R. 56(C). The moving party bears the burden of specifically designating materials that make a *prima facie* showing that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *Interstate Cold Storage, Inc. v. GMC*, 720

N.E.2d 727, 729 (Ind.Ct.App.1999), *trans. denied.* Once the movant meets these two requirements, the burden shifts to the nonmovant to set forth specifically designated facts showing a genuine issue for trial. *Id.* The nonmovant shows a genuine issue of fact "where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue." *Id.* at 730. Further, if the record reveals an incorrect application of the law to *undisputed* facts, summary judgment is inappropriate. *General Accident Ins. Co. of Am. v. Hughes*, 706 N.E.2d 208, 210 (Ind.Ct.App.1999), *trans. denied.*

### II. Journey's Account Statute

The Subagents first contend that the trial court improperly construed the Journey's Account statute[4] to bar Counts III–V and X, which the Subagents added by means of their amended complaint.

The Journey's Account statute generally permits a party to refile an action that has been dismissed on technical grounds. *See Vesolowski v. Repay*, 520 N.E.2d 433, 435 (Ind.1988). The statute allows a party to bring a "new action" as a "continuation of the original action," if the

---

lent Act; (2) Common Law Fraud; (3) Indiana Statutory Fraud (Ind.Code § 35–43–5–3(9)); (4) Indiana Statutory Deception (Ind. Code § 35–43–5–3(2)); (5) Indiana Criminal Mischief (Ind.Code § 35–43–1–2(a)(2)); (6) North Carolina Unfair Trade Practices Act; (7) South Carolina Unfair Trade Practices Act; (8) Civil Conspiracy; (9) Tortious Interference with a Business Relationship; (10) Negligence; (11) Indemnification; and (12) Accounting. R. at 57–72.

3. T.R. 54(B) provides in part:
    When more than one [1] claim for relief is presented in an action ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for entry of final judgment.

4. The Journey's Account statute provides:
    (a) This section applies if a plaintiff commences an action and the plaintiff fails in the action from any cause except:
    (1) negligence in the prosecution of the action;
    (2) the action abates or is defeated by the death of a party; or
    (3) a judgment is arrested or reversed on appeal.
    (b) *If subsection (a) applies, a new action may be brought not later than* the later of:
    *(1) three (3) years after the date of such determination under subsection (a);* or
    (2) the last date an action could have been commenced under the statute of limitations governing the original action;
    *and be considered a continuation of the original action commenced by the plaintiff.*
    IND.CODE § 34–1–2–8 (emphasis supplied) (recodified at IND.CODE § 34–11–8–1).

party brings the new action within three years after the original action failed. I.C. § 34–1–2–8. Typically, the statute saves "an action filed in the wrong court by allowing the plaintiff enough time to refile the same claim in the correct forum." *Cox v. Amer. Aggregates Corp.*, 684 N.E.2d 193, 195 (Ind.1997). For instance, if a party files an action in one state where it is dismissed for lack of personal jurisdiction, the party may refile in another state despite the "intervening running of the statute of limitations." *Id.*

Relying on *Vesolowski v. Repay*, Guffey and GARCO maintain that the counts added by the amended complaint are not part of the original action and, thus, are not saved by the Journey's Account statute. In *Vesolowski*, Donna Vesolowski brought a medical malpractice action against a doctor who had provided medical care during her pregnancy. She brought suit in Illinois only on behalf of her daughter who was born with severe and permanent brain damage. 520 N.E.2d at 434. The Illinois court dismissed the action for lack of personal jurisdiction over the doctor. Both Donna and her husband Charles subsequently refiled the original malpractice action on her daughter's behalf in an Indiana court and brought claims on their own behalf for the first time. *Id.* Our supreme court ruled that the Journey's Account statute did not save the parents' claims because they were brought for the first time in an Indiana court. *Id.* at 435. Guffey and GARCO contend that, based on *Vesolowski*, the Journey's Account statute does not preserve the claims added by the Subagents' amended complaint brought for the first time in an Indiana court. However, inasmuch as *Vesolowski* involved claims brought by new parties, it is inapplicable to the instant case.

Our decision in *Gulley v. Winter*, though, is controlling here. 686 N.E.2d 176 (Ind.Ct.App.1997). In *Gulley*, the plaintiff brought suit in a federal district court in Illinois against William P. Winter for injuries sustained in an automobile accident. The suit was subsequently transferred to a federal district court in Indiana where William filed an answer to the plaintiff's complaint, arguing that he was not the driver of the car that injured Gulley and that the federal court lacked diversity jurisdiction. In response, after the statute of limitations had run for initiating the action, Gulley filed a motion to amend the complaint by naming Frederick, William's son, as the driver of the car that had injured him. The federal district court granted the motion and then dismissed the action due to a lack of diversity jurisdiction.

A month later, Gulley refiled the amended complaint, now suing Frederick, in an Indiana trial court. The trial court held that the federal court's order granting the amendment was invalid because the federal court had no jurisdiction over the claim. The trial court then analyzed Gulley's amended complaint under Ind. Trial Rule 15(C), which governs the relation back of amended complaints. Finding that Frederick did not have notice of the lawsuit when it was originally filed, the trial court held that any amendment to the complaint attempting to substitute a party did not relate back to the original pleading.

On appeal to this court, we determined, using T.R. 15(C), the propriety of Gulley's amendment filed after the statute of limitations had run. We held that Gulley had failed to meet the party-notice requirements of T.R. 15(C), and, therefore, his amendment did not relate back to the original complaint. *Id.* at 181.

■ We note initially that a party may amend a pleading by leave of the court. T.R. 15(A). Here, the Subagents submitted an amended pleading to the trial court, in which they had added a negligence claim and claims under Indiana statutes. Though the trial court made no express ruling permitting the amended claim, it concluded in a summary judgment ruling that the amended claims were not part of the original action and were thus barred by the statute of limitations. Therefore, we will construe the trial court's subse-

quent treatment of the amended claims as an indication of its leave for the parties to have filed the amended claims in the first place.

The portion of T.R. 15(C) relevant to this action provides: "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." Because the amended claims have arisen out of the conduct set forth in the original complaint, they relate back to the original pleading. Hence, the amended claims are not barred by the statute of limitations and, like the original claims filed in the South Carolina federal district court, are preserved by the Journey's Account statute.

### III. Choice of Law

The Subagents also maintain that Indiana law, rather than South Carolina's, applies to the instant dispute. They claim that the contract they signed with GAR-CO, providing that the agreement be construed in accordance with Indiana law, requires Indiana law to be applied here.

■ Before launching into a conflict-of-laws analysis, we must first decide if our law is different from South Carolina's. *Hartford Accident & Indem. Co. v. Dana Corp.,* 690 N.E.2d 285, 291 (Ind.Ct.App. 1997), *trans. denied.* In South Carolina, the state in which the Subagents were licensed to sell insurance, insurance agents are considered "expert[s] dealing in a highly specialized business, with knowledge and means of knowledge not possessed by the average applicant for insurance." *Riddle–Duckworth, Inc. v. Sullivan,* 253 S.C. 411, 171 S.E.2d 486, 490 (1969). As an expert,

> where an insurance agent or broker, with a view toward being compensated, undertakes to procure insurance for a member of the public, the law holds the agent or broker to the exercise of good

faith, and reasonable skill, care and diligence in performing the obligation. *Id.* In sum, the law of South Carolina presumes that the Subagents are experts, knowledgeable about the insurance products they sell.

In adopting this standard, the *Riddle–Duckworth* court reasoned, "Insurance has long been recognized as a business affected with the public interest." *Id.* Moreover, the insurance industry "is a complicated business and its intricacies often confuse the average laymen." *Id.* The court also recognized that the South Carolina legislature's licensing requirements were designed "to place the business of insurance in competent and trustworthy hands." *Id.*

■ Indiana, no less concerned about the insurance industry's complexity or the public welfare, holds its insurance agents and brokers to the same standard of care. Our General Assembly has provided stringent licensing requirements, including a mandatory "insurance agent program of study," IND.CODE § 27–1015.5–4(g)(1), and written examinations testing the agent's knowledge of "lines of insurance, policies, and transactions to be handled." I.C. § 27–1–15.5–4(g)(5). Furthermore, this court has observed: "An insurance agent holds himself out as an expert in the field and invites his client to rely upon his expertise in procuring a policy consistent with his needs." *Bulla v. Donahue,* 174 Ind.App. 123, 127, 366 N.E.2d 233, 236 (1977). Needless to say, an insurance agent or broker must be knowledgeable about the contents of a policy to "procure a policy consistent with his [client's] needs." *Id.*

■ Given their legal status as experts, knowledgeable of the insurance policy's contents, the Subagents could not have reasonably relied on Guffey's misrepresentations about the front-end load. The plain terms of the Flex II show that the policy's guaranteed cash value does not exceed the premiums paid until the seventh year of the policy's life. R. at 1193.

The Subagents are held to have known about the front-end load and, hence, cannot complain that they suffered fraud through reasonable reliance. *Cf. Plymale v. Upright,* 419 N.E.2d 756, 762 (Ind.Ct. App.1981) (holding that a person cannot reasonably rely on a misrepresentation when the contents of a written instrument contradict the alleged misrepresentation).

## CONCLUSION

In light of our discussion above, we conclude that 1) Counts III–V and X of the Subagents complaint were preserved by the Journey's Account statute and, 2) the Subagents, given their status as experts in the policies they sell, could not have reasonably relied on Guffey's misrepresentations about the Flex II's front-end load.

Judgment affirmed in part, reversed in part, and remanded to the trial court for further proceedings not inconsistent with this opinion.

SHARPNACK, C.J., and VAIDIK, J., concur.