

**FILED**

Sep 09 2016, 8:29 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Eric E. Snouffer | Larry A. Mackey |
| Snouffer & Snouffer | Mark J. Crandley |
| Fort Wayne, Indiana | Barnes & Thornburg LLP |
|  | Indianapolis, Indiana |
|  |  |
|  | Daniel Sigler |
|  | Sigler Law LLC |
|  | Fort Wayne, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Julie R. Waterfield, | September 9, 2016 |
| *Appellant-Plaintiff/Counter Defendant,* | Court of Appeals Case No. 92A03-1511-PL-1968 |
| v. | Appeal from the Whitley Superior Court |
| Richard D. Waterfield, | The Honorable Douglas M. Fahl, Judge |
| *Appellee-Defendant/Counter-Plaintiff.* | Trial Court Cause No. 92D01-0311-PL-232 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Plaintiff/Counter-Defendant, Julie R. Waterfield (Julie), appeals the trial court's order denying her request to set aside the divorce decree entered in 1997 based on the allegation of fraud committed by Appellee-Defendant/Counter-Plaintiff, Richard D. Waterfield (Richard), while negotiating a settlement leading to the dissolution of the marriage.[1]

We affirm.

## ISSUES

Julie raises seven issues on appeal, which we consolidate and restate as the following four issues:

> (1) Whether the trial court properly denied Julie's attempt to set aside the Settlement Agreement she entered into based on fraud;
>
> (2) Whether the trial court erred when it denied Julie's motion for summary judgment on Richard's counterclaim for abuse of process;
>
> (3) Whether the trial court properly sanctioned Julie for violating her court-ordered discovery obligations; and

---

[1] Even though the confidential filings were voluminous in this case, we have endeavored to maintain confidentiality on appeal where appropriate. But an appellate judicial opinion that both decides the case and articulates the law requires consideration of the underlying facts. Thus, we have included a number of facts derived from confidential records in this opinion because we deem such information to be essential to the resolution of the litigation and appropriate to further the establishment of precedent and the development of the law. *See Drake v. Dickey*, 2 N.E.3d 30, 32 (Ind. Ct. App. 2013, *aff'd*, 12 N.E.3d 875 (Ind. 2014).

(4) Whether the trial court properly granted Richard an award of attorney fees.

## FACTS AND PROCEDURAL HISTORY

[4] Julie and Richard were married in 1968. After 29 years of marriage, Julie filed for a decree of dissolution on May 19, 1997. On August 25, 1997, without taking any discovery, Julie commenced settlement negotiations with an opening offer of $25 million in cash, unstructured. Meanwhile, Richard had provided Julie with an informal preliminary spreadsheet (the Disclosure Statement), enumerating the property that Richard assumed to be part of the marital estate. A final version of the Disclosure Statement was served on Julie on September 22, 1997. On October 9, 1997, and upon the expiration of her offer to settle, Julie served an initial discovery request on Richard, seeking information about the assets in the marital estate and their corresponding value. While Julie's counsel served the discovery, the parties continued their settlement discussions. Simultaneously with seeking a settlement, Julie's counsel advised Julie not to settle without conducting detailed discovery into the marital estate. On three separate occasions, Julie's counsel warned her that "based upon what [Richard] has condescended to disclose to us, it is clear that you want to agree to substantially less than what the [c]ourt would grant you." (Appellant's App. p. 568).

[5] Despite her attorney's warnings and cautions, Julie chose to settle the dissolution and entered into a settlement agreement (Settlement Agreement), in which Richard agreed to provide Julie $20 million in assets, consisting of $19,477,000 in cash and a lake cottage on Clear Lake, near Fremont, Indiana. The divorce decree was entered

on December 22, 1997, and incorporated the Disclosure Statement and the Settlement Agreement. The Settlement Agreement provided that "[t]he parties agree that the value and components of the [m]arital [e]state have previously been discussed by them. The parties further agree that they have had the opportunity to confer with separate counsel regarding the value and components of the [m]arital [e]state, and the agreed-upon division of the [m]arital [e]state." (Appellant's App. p. 182). A handwritten annotation to this paragraph further elaborates that "[Richard] represents that he has disclosed to [Julie] his material assets (including property owned jointly with [Julie]) that he owned on 5-19-97 and his material liabilities on such date." (Appellant's App. p. 182). On January 28, 1998, roughly a month after the dissolution, Julie consulted with her attorney and expressed her regret to have entered into the Settlement Agreement without full disclosure or discovery.

[6] On July 12, 2003, almost six years after the dissolution of her marriage, Julie filed a Complaint, asserting that the Disclosure Statement provided by Richard had undervalued assets in the marital estate and failed to identify and include others. In her Complaint, she sought to set aside the Settlement Agreement and dissolution of marriage decree, essentially claiming that Richard had committed fraud to the value of $80 million. On March 1, 2004, Richard filed a counterclaim for abuse of process and for statutory attorney fees. On July 8, 2005, Richard moved for partial summary judgment on whether Julie could assert a fraud claim based on Richard's alleged misstatement on the value of the marital assets. On March 16, 2006, the trial court granted the motion for partial summary judgment as to all of Julie's claims based on the valuation of assets. In its order, the trial court found, in part, as follows:

> Valuation is an issue of opinion that must be developed as part of a litigant's case and can be subject to contrary arguments during a lawsuit. The undisputed facts show that [Julie] did not use the tools of discovery, did not retain experts or have the marital assets valued for herself. Instead she settled the dissolution proceeding without exploring what the value of the marital assets were or developing her own case as to the value of those assets.

(Appellant's App. p. 54).

[7] During these proceedings, Julie made multiple allegations regarding her knowledge of the marital assets and their corresponding values in settling her divorce. Specifically, she alleged that Richard had deprived her of all assets and liabilities of the parties' marital estate, maintaining exclusive control thereof, as well as being dependent on Richard's representations. To defend against these claims, Richard sought access to the entire file of Julie's divorce counsel. Julie objected based on privilege grounds. After protracted litigation, the trial court ultimately found a partial waiver of the privilege and allowed Richard to access seven documents from Julie's divorce attorney's file. On March 31, 2009, Richard filed his motion for summary judgment. After a hearing, the trial court entered summary judgment in favor of Richard on all of Julie's claims.

[8] On December 3, 2012, Julie moved for summary judgment on Richard's counterclaim for abuse of process and for statutory attorney fees, which was subsequently denied by the trial court on October 2, 2013. On February 28, 2014, Julie requested certain documents from Richard related to his claim for attorney fees. In turn, on June 17, 2014, Richard served Julie with a discovery request, seeking

information as to when Julie's attorney reviewed the file of her divorce counsel, as well as the fees and rates charged by Julie's lawyer. When Julie objected to the discovery, Richard moved to compel Julie's response on September 25, 2014, which was granted by the trial court on October 24, 2014. The trial court ordered Julie to provide responses to Richard's discovery within ten days, or by November 3, 2014. On that day, Julie served discovery responses, reiterating that she continued her objections to much of the discovery. Three days later, on November 6, 2014, Julie sought reconsideration of the discovery order, which was subsequently denied on November 26, 2014.

[9] On November 10, 2014, Richard moved for a default judgment as a discovery sanction due to Julie's non-production of the requested discovery and failure to diligently litigate the case. Nine days later, Julie filed her response to Richard's motion for sanctions, again repeating the objections already rejected by the trial court and asserting:

> She is not in a position to contest the reasonableness of [Richard's] attorney fees. That is not to say that [Julie] is admitting that fees are owed in any way or that the disclosed fees are admissible at trial. Only that [Julie] is not in a position to dispute the reasonableness of the disclosed fees during a trial in this matter.

(Appellant's App. p. 1800).

[10] On December 2, 2014, the trial court heard argument on the motion for sanctions, including the sanction of default. Despite the November 3, 2014 deadline, Julie still had not complied with the order compelling responses to the counterclaim discovery

at the time of the hearing. Thus, Richard expressly asked the trial court to grant the requested relief of a default judgment against Julie. At the close of the evidence, the trial court took Richard's request under advisement.

[11] Two days after the hearing, on December 4, 2014, Julie's attorney commenced to compile documents responsive to Richard's counterclaim discovery request. On December 29, 2014, Richard filed a notice with the trial court, notifying it of the status on the outstanding discovery requests. At that point, Richard had still not received complete discovery requests. On January 5, 2015, Richard again filed an updated notice regarding Julie's discovery responses with the trial court. The notice indicated that although Julie had provided some additional documents, she remained in noncompliance in many respects.

[12] On January 14, 2015, the trial court entered a default judgment as a discovery sanction against Julie. The trial court found that Julie had engaged in a "repetitive pattern" of disregarding the trial court's discovery orders and her discovery obligations. (Appellant's App. p. 125). While the trial court opined that Julie had been "given every opportunity to comply with the [c]ourt's Order compelling discovery," the court concluded that Julie had "failed to comply with said Order." (Appellant's App. p. 125). As such, allowing Julie even more time to satisfy her obligations "would be fruitless and result only in further stalling and delay." (Appellant's App. p. 126).

[13] Because the default judgment established liability on Richard's counterclaim for attorney fees, Richard petitioned the trial court for an award on March 5, 2015. Julie

responded to this petition on June 24, 2015, and informed the trial court, for the first time, that she was prevented from responding to the counterclaim discovery due to an illness of her attorney and acknowledged that she still had not complied with the trial court's order compelling discovery. In his affidavit, Julie's attorney affirmed that he had begun gathering documents responsive to the counterclaim discovery on December 4, 2014. However, on December 14, 2014, he became incapacitated to the extent that he had to be admitted to the hospital. Julie's attorney acknowledged that while "the total fees produced" by Julie from December 1, 2001 till November 21, 2014 amounted to ". . . approximately $3[.]659 million. The actual amount billed . . . was considerably higher." (Appellant's App. p. 2002). On October 23, 2015, the trial court awarded Richard attorney fees in the amount of $842,021.

[14] Julie now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[15] Almost twenty years after the dissolution of her marriage to Richard, Julie appeals to this court in an effort to re-open the Settlement Agreement underlying the divorce decree. Claiming to have been the victim of fraud, Julie maintains that Richard misrepresented both the composition and value of the assets in the marital estate. Specifically, she asserts that by exploiting her trust, Richard induced Julie "to accept a divorce settlement that was more than $80,000,000 below that to which she was entitled." (Appellant's Br. p. 15). Within this overarching fraud allegation, Julie also disputes the trial court's summary judgment rulings on her claims with respect

to attorney-client communications and the default judgment on Richard's counterclaims.

## I. *Fraud*

[16] Indiana encourages settlement agreements to "promote the amicable settlements of dissolution-related disputes," on the expectation that "freedom of contract will . . . . produce mutually acceptable accords, to which parties will voluntarily adhere." *Pohl v. Pohl*, 15 N.E.3d 1006, 1010 (Ind. 2014) (quoting *Voight v. Voight*, 670 N.E.2d 1271, 1277-78 (Ind. 1996)). A property settlement that is incorporated into a final divorce decree is considered a binding contract, and the dissolution court may not modify that settlement absent fraud, duress, or undue influence. *Rothschild v. Devos*, 757 N.E.2d 219, 223 (Ind. Ct. App. 2001). Because there is a strong presumption of enforceability of contracts that represent the freely bargained agreement of the parties, Indiana courts have not hesitated to enforce a divorce settlement agreement that would have been in excess of the divorce court's authority had it been crafted by the divorce court and that was shown to be, over time, grossly inequitable. *Pond v. Pond*, 700 N.E.2d 1130, 1136 (Ind. 1998). The interpretation of such an agreement, as with any other contract, presents a question of law and is reviewed *de novo*. *Bailey v. Mann*, 895 N.E.2d 1215, 1217 (Ind. 2008). Although a court is not bound to accept every proffered settlement, "[i]n reviewing a settlement agreement, a court should concern itself only with fraud, duress, and other imperfections of consent, or with manifest inequities, particularly those deriving from great disparities in bargaining power." *Voight*, 670 N.E.2d at 1278. However, "the power to disapprove a settlement agreement must be exercised with great restraint. A trial judge should

not reject such agreements just because she believes she could draft a better one." *Id.* at 1277.

[17] Here, Julie is attempting to set aside the Settlement Agreement by contending that fraud occurred pursuant to Indiana Trial Rule 60(B) during the negotiations which culminated in the Settlement Agreement. We review the grant or denial of a Trial Rule 60(B) motion for relief from judgment under an abuse of discretion standard. *Ross v. Bachkurinskiy*, 770 N.E.2d 389, 392 (Ind. Ct. App. 2002). The trial court must balance the need for an efficient judicial system with the judicial preference for deciding disputes on the merits. *Id.* On appeal, we will not find an abuse of discretion unless the trial court's decision is clearly against the logic and effect of the facts and circumstances before it or is contrary to law. *Packer v. State*, 777 N.E.2d 733, 738 (Ind. Ct. App. 2002), *disapproved of on other grounds by Mosley v. State*, 908 N.E.2d 599 (Ind. 2009). To meet the fraud requirement, Julie must show that "a material representation of a past or existing fact was made which was untrue and known to be untrue by the party making it, or else recklessly made, and that another party did in fact rely on the representation and was induced thereby to act to his detriment." *Plymale v. Upright*, 419 N.E.2d 756, 760 (Ind. Ct. App. 1981).

[18] Julie's fraud argument is essentially two-fold: first, she asserts that she did not rely on the privileged communications with her divorce counsel, but secondly, she maintains that she did rely on Richard's misrepresentations of the value of certain assets of the marital estate. Reliance upon a misrepresentation is a material element of the cause of action in fraud. *Id.* Reliance consists of two distinct parts: the fact of reliance and the right of reliance. *Id.* at 761. While the fact of reliance means that

the plaintiff actually relied on the misrepresentation, the right to rely is "more difficult to determine." *Id.* at 762. The right to rely "is bound up with the duty of [an individual] to be diligent in safeguarding his interests." *Id.* "The legal obligation that a person exercise the common sense and judgment of which he is possessed is a practical limitation on the actionability of various representations." *Id.* Thus, "if a party blindly trusts, where he should not, and closes his eyes, where ordinary diligence requires him to see, he is willingly deceived and . . . cannot receive an injury." *Pugh's IGA, Inc. v. Super Food Services, Inc.*, 531 N.E.2d 1194, 1199 (Ind. Ct. App. 1988) (quoting *Frenzel v. Miller*, 37 Ind. 1, 17 (Ind. 1871)), *reh'g denied, trans. denied*.

### A. *Privileged Communications*

As a basis for her fraud allegation, Julie takes the position that she was ignorant of her rights and responsibilities in choosing to settle the divorce proceedings. She maintains that, despite the tools of civil discovery available to her, she stood in an inferior position to Richard with respect to the composition and value of the marital estate and had no cause, reason, nor avenue to independently discover or value the estate. Therefore, as a result, she relied exclusively on Richard's representations as memorialized in the Discovery Statement. In an attempt to prevent protracted litigation in a decade old dissolution decree, Richard sought the disclosure of Julie's divorce counsel's attorney-client communications purporting to show that Julie was warned against settling the divorce before full disclosure was made of the assets of the marital estate. Faced with Richard's motion to compel the production of certain documents of Julie's divorce attorney's file, the trial court opined that the requested

discovery was critical evidence relevant to Julie's claim of reliance, ignorance, and inferior position. Waiving the privilege over these documents, the trial court recognized that these documents were the only source of information that could call the veracity of Julie's allegations into doubt.

### 1. *Waiving the Privilege*

[20] Julie now contends that the trial court erred in waiving the privileged nature of certain documents with attorney-client communications. "The attorney-client privilege is one of the oldest recognized privileges for confidential communications. *Purdue University v. Wartell*, 5 N.E.3d 797, 806 (Ind. Ct. App. 2014). The privilege is intended to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice. *Id.* "The privilege applies to all communication between the client and his attorney for the purpose of obtaining professional legal advice or aid regarding the client's rights and liabilities." *Corll v. Edward D. Jones & Co.*, 646 N.E.2d 721, 724 (Ind. Ct. App. 1995).

> The attorney-client privilege protects against judicially compelled disclosure of confidential information regardless of whether the information is to be disclosed by way of testimony or by court-ordered compliance with a discovery request which a party has attempted to resist. The harm to be prevented is not the manner in which the confidence is revealed, but the revelation itself.

*P.T. Buntin, M.D., P.C. v. Becker*, 727 N.E.2d 734, 740 (Ind. Ct. App. 2000). "It is well settled, however, that the confidential relationship of attorney and client is not absolute for all purposes, but is a privilege which belongs to the client, and the client

alone, to claim or waive; and where the client himself testifies concerning the privileged matter, he then waives the privilege." *Key v. State*, 235 N.E.2d 175 (Ind. 1956). Accordingly, like most privileges, the attorney-client privilege may be expressly or implicitly waived. *Brown v. Edwards*, 640 N.E.2d 401, 406 (Ind. Ct. App. 1994), *trans. denied*.

[21] In the absence of an express waiver of the attorney-client privilege by Julie, we turn to whether Julie implicitly waived the confidentiality of her divorce attorney's communications. Concluding that Julie waived the privilege, the trial court relied on *Mountain States Tel. & Tel. Co. v. DiFede*, 780 P.2d 533 (Colo. 1989), which it found to be on all fours with the situation before us. In *DiFede*, the plaintiff filed a complaint seeking to set aside a transfer of real property and change of beneficiary executed by her ex-husband, while the defendant asserted the claims were barred by a separation agreement the plaintiff had signed. *Id*. at 537-38. The plaintiff sought to rescind the separation agreement, contending she had been fraudulently induced to sign it because her then-husband's attorney, Raymond Wilder, had misled her about the enforceability of the agreement when she signed it. *Id*. at 538. The defendant responded that the plaintiff's reliance on the attorney's statements was unreasonable because she had met with another attorney, Jack Foutch, ten days after she signed the agreement who "must have told her" the agreement was enforceable. *Id*. The *DiFede* court held that plaintiff had waived the attorney-client privilege with respect to her conversation with Foutch, explaining:

> When she alleged that she reasonably relied on Raymond Wilder's incorrect statement of the law, [plaintiff] injected her knowledge or lack of knowledge of the correct statement of the law as a crucial issue

relevant to her claim of fraud-in-the-inducement. Only Jack Foutch and [plaintiff] know whether Jack Foutch disabused her of the incorrect notion that the separation agreement was not immediately enforeceable. It would be unfair for [plaintiff] to thrust her lack of knowledge of the correct state of the law into the litigation by her claim of fraudulent inducement while simultaneously retaining the attorney-client privilege to frustrate attempts by [defendant] to prove [her] knowledge of the correct state of the law and thereby negate the very foundation necessary to prevail in [plaintiff's] claim of fraudulent inducement.

*Id.* at 544. In reaching this conclusion, the Colorado Supreme Court articulated a three-prong test for establishing implied waiver. *Id*. at 543-44. First, the "assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party." *Id*. at 544. Second, "through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case." *Id*. And third, applying the "privilege would [deny] the opposing party access to information vital to his defense." *Id*.

[22] In her Complaint, Julie contended that she reasonably relied on Richard's representations of the composition and value of the assets in the marital estate. She asserted that Richard

> maintained exclusive control over, and made all decisions concerning, the business activities involving the parties' marital assets. [Richard] also maintained all information regarding the assets and liabilities of the parties' marital assets, depriving Julie of any access to that information. Therefore, as [Richard] intended, Julie was dependent on [Richard's] representations as to the extent and value of the parties' marital assets in making her decision to enter into the [Settlement Agreement].

(Appellant's App. p. 155). In her answers to counterclaims, Julie claimed that she "was never provided with an honest and complete explanation with regard to the meaning, significance or consequence of the documents she was asked to sign by [Richard], including the Settlement Agreement." (Appellant's App. p. 219). And in her response to requests for admissions, when asked to admit that she could have obtained an independent valuation, Julie asserted that she was not "given reason to, or would have thought to ask for such." (Appellant's App. p. 1961).

[23] By Julie placing her complete and ultimate reliance on Richard's representations at the core of her fraud allegation, Richard sought to refute these claims by requesting access to Julie's divorce attorney's file as these "communications with Julie are the only source of the information regarding what [her divorce attorney] told her about the marital estate, the process for discovery of it, and the settlement." (Appellee's Br. p. 28). Julie objected, claiming that those communications were shielded by the client-attorney privilege.

[24] Similar to the plaintiff in *DiFede*, when Julie alleged that she had relied exclusively on Richard's representations and Disclosure Statement, Julie injected her knowledge or lack of knowledge of her alternatives and legal discovery tools as a crucial issue relevant to her claim of fraud. Only Julie's divorce attorney and Julie would know whether her divorce counsel disabused her of the incorrect notion that she had no other alternatives than to rely on Richard. Although Julie now contends that Richard could have obtained this information through her deposition, Julie's argument simply changes the forum in which the privilege would have been raised.

Regardless of the discovery device, Julie would have continued to shield herself behind the privileged nature of the attorney-client communication.

[25] Indiana courts have previously held that evidentiary privileges created "to shield selected information from discovery . . . may not be wielded as swords at the will of a party." *Madden v. Ind. Dept. of Transp.*, 832 N.E.2d 1122, 1128 (Ind. Ct. App. 2005). In other words, "a party may not place an issue before the trier of fact and then assert a privilege to prohibit the introduction of evidence regarding that issue." *Id.* Julie may not repeatedly testify to her alleged inferior standing, claim ignorance of the right to conduct discovery and independent valuations, and use that testimony as a sword against Richard while, at the same time, shielding Richard's effort to obtain evidence to the contrary by asserting the privilege. By repeatedly disclaiming her divorce attorney's influence and advice in the matter and stating that she only relied upon Richard's representation, Julie relinquished her right to hide evidence to the contrary behind her privilege. By having chosen the sword, Julie must now relinquish the shield. Accordingly, the trial court did not abuse its discretion by waiving the privilege.

## 2. *Right to Rely*

[26] The disclosed privileged communications unequivocally establish that Julie was advised not to settle the dissolution proceeding before full discovery was conducted. Julie's divorce attorney cautioned Julie on at least three separate occasions that her share of the marital estate would increase beyond what she was willing to settle for if

she engaged in discovery. Specifically, on October 9, 1997, divorce counsel sent a letter to Julie, informing her:

> Without conducting discovery, there is no way that we know how much your marital estate is worth, how it is structured, or how it is in your best interest to divide it. Basically, I cannot advise you to make any proposal to settle and strongly advise you against making any decisions before having full disclosure and appraisals.

(Appellant's App. p. 567). Julie signed an acknowledgment, foregoing her attorney's legal advice to conduct discovery. On November 13, 1997, Julie's divorce counsel again required Julie to sign a similar acknowledgment. In this letter, Julie was advised:

> Once again, I must advise you against proceeding in this manner. You have not allowed me to conduct discovery, obtain appraisals, or consult financial experts as is necessary with this type of marital estate. Further based upon what [Richard] had condescended to disclose to us, it is clear that you want to agree to substantially less than what the [c]ourt would grant you. There is no doubt in my mind that you would receive 50%, if not more, of the marital net worth. Based upon [Richard's] disclosure which I would presume offer low valuations, you are accepting less than one third. Clearly, this is not in your best interest. Please acknowledge your understanding of my advice by signing below.

(Appellant's App. p. 574). Julie signed the letter. Shortly before the settlement, Julie received a third caution from her attorney. On December 12, 1997, Julie was informed:

> Once again, I must advise you against entering into the property settlement your husband is proposing. Without a doubt the settlement

to you therein of $20,000,000 is substantially less than that which a court would order. I strongly advise you to turn down this offer, arrange for appraisals and conduct full discovery, and negotiate for a minimum of 50%. As you are aware, I have been extremely unhappy with the limited and incomplete documentation which [Richard] has condescended to give us. Its incomplete nature makes me highly suspicious that even the limited disclosure is not accurate. Based even upon that limited disclosure, you are accepting substantially less than 50% of what he is willing to admit the net worth of the marital estate is.

Please reconsider your decision to enter this [Settlement Agreement]. In the event that you do wish to proceed, please indicate that you understand my concerns and advice by signing below.

(Appellant's App. p. 575). Again, Julie acknowledged her attorney's caution but entered into the Settlement Agreement within days of the letter.

[27] Accordingly, Julie was aware that unless she conducted discovery into the assets and liabilities of the marital estate, she would receive substantially less by entering into the Settlement Agreement. Now, nearly two decades later, Julie decides she wants to follow her divorce attorney's advice and probe the values of the marital assets by alleging Richard committed fraud by misrepresenting the net worth of the marital estate—misrepresentations upon which she claimed to have relied on exclusively.

[28] However, by acknowledging that she understood the risk when declining to conduct a full discovery, Julie surrendered her right to rely on Richard's representations. Because Julie "blindly trusted," against the advice of her attorney, and "closed her eyes, where ordinary diligence required her to see," she became willingly deceived and therefore cannot claim to have exclusively relied on Richard. *See Pugh's IGA,*

*Inc.*, 531 N.E.2d at 1199. Thus, "[o]ne who knows of a risk and voluntarily exposes one's self to that risk cannot later recover for a resulting injury." *Kaken Pharmaceutical Co., Ltd. v. Eli Lilly and Co.*, 737 F. Supp. 510, 519 (S.D. Ind., 1989) (applying Indiana law); *Frenzel*, 37 Ind. at 17. Parties on notice to a possible misrepresentation cannot refuse to use tools available to them to learn of the true facts and later claim a right to rely on the misrepresentation. *See, e.g., McCutchan v. Blanck*, 846 N.E.2d 256, 265 (Ind. Ct. App. 2006) ("[A] purchaser of property has no right to rely upon the representations of the vendor of the property as to its quality, where he has a reasonable opportunity of examining the property and judgment for himself as to it qualities."). Julie's acknowledgment of her counsel's advice but subsequent denial to comply with it prevent her now from bringing a fraud claim as she cannot establish a right to rely on Richard's alleged misrepresentations of the marital estate.[2]

## II. *Abuse of Process*

Next, Julie contends that the trial court erred by denying her summary judgment on Richard's counterclaim of abuse of process. Our standard of review for summary judgment appeals is well established. We review summary judgment *de novo*, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the nonmoving parties, summary judgment is appropriate of the designated evidentiary matter shows that there is no genuine issue as to any material

---

[2] Because we affirm the trial court's decision based on the ground that Julie cannot establish a right to rely, we do not need to analyze whether Richard misrepresented the composition and value of the marital estate.

fact and that the moving party is entitled to judgment as a matter of law." *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009). The initial burden is on the summary-judgment movant to "demonstrate[] the absence of any genuine issue of fact as to a determinative issue," at which point the burden shifts to the non-movant to to "come forward with contrary evidence" showing an issue for the trier of fact. *Id.* at 761-62 (internal quotation marks and substitution omitted). And "[a]lthough the non-moving party has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he or she was not improperly denied his or her day in court." *McSwane v. Bloomington Hosp. & Healthcare Sys.*, 916 N.E.2d 906, 909-10 (Ind. 2009) (internal quotation marks omitted).

[30]     A party claiming abuse of process must show a misuse or misapplication of process for an end other than that which it was designed to accomplish. *I.A.E., Inc. v. Hall*, 49 N.E.3d 138, 157 (Ind. Ct. App. 2015), *trans. denied*. The two elements of abuse of process are: (1) ulterior purpose or motives; and (2) a willful use of process not proper in the regular conduct of the proceedings. *Id.* "If a party's acts are procedurally and substantively proper under the circumstances, then the party's intent is irrelevant." *Estate of Mayer v. Lax, Inc.,* 998 N.E.2d 238, 256 (Ind. Ct. App. 2013) (quoting *Watson v. Auto Advisors, Inc.*, 822 N.E.2d 1017, 1029 (Ind. Ct. App. 2005), *trans. denied*), *trans. denied*. There is no basis for an abuse of process claim if legal process is used to accomplish an outcome that the process was designed to accomplish. *Id.* "The purpose for which the process is used is the only thing of

importance." *Nat'l City Bank of Ind. v. Shortridge*, 689 N.E.2d 1248, 1252 (Ind. 1997), supplemented at 691 N.E.2d 1210 (Ind. 1998).

[31] "The gravamen of [abuse of process] is not the wrongfulness of the prosecution but some extortionate perversion of lawfully initiated process to illegitimate ends." *Id.* Unlike a malicious prosecution action, an action for abuse of process does not necessarily require proof that the action was brought without probable cause or that the action terminated in favor of the party alleging abuse of process. *Lindsay v. Jenkins*, 574 N.E.2d 324, 326 (Ind. Ct. App. 1991), *trans. denied.* It does appear, however, that an action's lack of validity can be highly relevant in examining an abuse of process claim. Our supreme court has held that the reasonableness of an attorney's action instituting litigation should be judged by an objective standard and whether "'no competent and reasonable attorney familiar with the law of the forum would consider that the claim was worthy of litigation on the basis of the facts known by the attorney who instituted suit.'" *Shortridge*, 689 N.E.2d at 1253 (quoting *Wong v. Tabor*, 422 N.E.2d 1279, 1288 (Ind. Ct. App. 1981)). There must be evidence that an attorney filed a claim for a purpose other than aiding his or her client in adjudicating his or her claim. *Id.* Additionally, there must be evidence that the attorney "'knowingly initiated proceedings for a clearly improper purpose,'" which requires more than evidence of a questionable belief as to the merits of a case, or the failure to fully investigate all facts before filing suit. *Id.* (quoting *Wong*, 422 N.E.2d at 1287).

[32] On November 12, 2003, Julie initiated the lawsuit by claiming that Richard had undervalued and understated the marital assets in his Disclosure Statement

incorporated in the 1997 divorce decree. Denying these allegations, Richard filed a counterclaim for abuse of process on March 1, 2004. Julie filed a motion for summary judgment on Richard's counterclaims, which was subsequently denied by the trial court on October 2, 2013.

[33]     In denying summary judgment, the trial court concluded, in pertinent part,

> 12. Taken in the light most favorable to Richard, the facts show that in a short span between 2002 and 2003, the following events occurred: (1) Richard re-married; (2) Julie's attitude toward him worsened; (3) she gradually cutoff communications with him; (4) she began claiming that she was wronged in the divorce; (5) she retained as her lawyer an individual with whom she had previously maintained a serious romantic relationship; and (6) she filed the lawsuit.

> 13. These facts create an inference that Julie filed her lawsuit for the ulterior motive of causing stress and emotional damage to Richard.

> 14. Julie's desire to hold this lawsuit over Richard's head as a punitive measure is further demonstrated by her actions in prosecuting it. While her claims were still pending, she did not even take a single deposition but allowed the case to linger on the [c]ourt's docket for years. She refused to communicate with Richard, work to resolve family differences, or even come to *any* [c]ourt hearings at which Richard would be in attendance.

> 15. Indeed, Julie has told her children and family counselor that she did *not* bring this action to recover damages or obtain the type of monetary relief she claims is the appropriate remedy for her fraud claim. She has specifically told Richard's daughter that the case was not about obtaining the very monetary recovery she claims is her motive.

16.   Richard is entitled to all inferences from the facts to be taken in his favor.  Given the context out of which this lawsuit arose and Julie's own statements and conduct, there is at a minimum a dispute of fact about whether she engaged in this frivolous and failed litigation for an ulterior motive of spite, revenge and a desire to cause harm, harassment and emotional distress to Richard.

17.   Julie is also not entitled to summary judgment on the second element of the abuse of process claim, which involves "a willful act in the use of process not proper in the regular conduct of the proceeding."

* * *

20.   Julie's lawsuit was not an "authorized or "proper use of process but has instead been found to be legally and factually deficient in the [c]ourt's earlier two summary judgment orders.

* * *

25.   Julie's own affidavit creates an issue of fact about her proper use of process.  [Julie's divorce attorney's] notes show that she met with Julie about a month after the divorce became final and that Julie acknowledged her regret about the settlement, stating that it was without full disclosure or discovery.  In a note in her file, [Julie's divorce attorney] stated that: "Near end of meeting, client tells me that she really appreciated everything I did for her, realizes she really restricted me by refusing to allow pursuit of full discovery.  Says that looking back, she knows I was right and that she should have permitted it, as she could have still decided to take the same agreement she did (but be fully informed)."  However, Julie's own affidavit creates an issue of fact on this issue by directly contradicting what [her divorce attorney] said: "In the weeks and months following the divorce settlement, I never expressed to [my divorce attorney] the statements she attributed to me in her January 1998 notes, namely,

that I regretted the settlement or that I apologized for any actions I took with respect to the divorce litigation." Far from supporting summary judgment in her favor, Julie's statement contesting [her divorce attorney's] notes itself creates an issue of fact that cannot be resolved on her motion for summary judgment.

(Appellant's App. pp. 103-104, 106) (internal references omitted).

[34] The designated facts reflect that Julie, even though the divorce decree was issued in 1997, waited until 2003 before filing the current lawsuit, alleging fraud in an attempt to set aside the divorce decree. Shortly before the filing, counsel from both parties met to discuss the merits of Julie's anticipated suit. Nevertheless, after the meeting, she filed the lawsuit without waiting for the letter that her own counsel had requested regarding the issues addressed at the meeting. Julie's current counsel did not review her divorce counsel's file, which would have revealed her divorce counsel's advice pertaining to the settlement and which could have prevented these proceedings. During the ensuing litigation, Julie did not take a single deposition and allowed the case to remain inactive on the trial court's docket. Accordingly, we cannot say that Julie used the legal process to accomplish an outcome which the process was designed to accomplish. *See Estate of Mayer*, 998 N.E.2d at 256.

[35] Julie now maintains that there must be some action other than pursuing a lawsuit to support abuse of process. However, misusing the process is the core of the tort— once that burden of proof is satisfied, no other action needs to be established. "There is no liability for use of the legal process *unless* it has been used to achieve an end other than one which the process was designed to accomplish." *Central Nat'l Bank of*

*Greencastle v. Shoup*, 501 N.E.2d 1090, 1095 (Ind. Ct. App. 1986), *reh'g denied*. "The only important factor is the purpose for which the process is utilized." *Id.*

[36] Turning to Julie's intention, we note, like the trial court, that there is a genuine issue of material fact that Julie's motive in pursuing a 'do-over' of the divorce decree was honorable. Although Richard appeared to try to repair their relationship even after the divorce was finalized, Julie told her friends that she filed for divorce to "teach [Richard] a lesson" and to impress upon him the need to prioritize "her needs and giv[e] her more respect." (Appellant's App. p. 1654). Despite Julie's claim that her motivation for bringing the suit rested on her desire to re-litigate the marital estate after discovering the alleged fraud in 1999, the designated evidence reflects that Julie's attitude worsened after she realized that Richard "had moved on and began traveling with [his] new companion and future wife." (Appellant's App. p. 1654). Julie gradually lessened communications while her hostility increased, resulting in an escalation of the situation with Richard's remarriage in 2002. Even though she knew about the purported fraud, she did not file the present suit until 2003, after Richard had remarried.

[37] Our supreme court has held that the reasonableness of an attorney's action instituting litigation should be judged by an objective standard and whether "'no competent and reasonable attorney familiar with the law of the forum would consider that the claim was worthy of litigation on the basis of the facts known by the attorney who instituted suit.'" *Shortridge*, 689 N.E.2d at 1253 (quoting *Wong*, 422 N.E.2d at 1288). The facts before us, especially the timing of the lawsuit together with the absence of an investigation into Julie's divorce attorney's file prior to initiation, lead us to

conclude that there is a genuine issue of material fact that Julie misapplied the judicial process for an end other than that which it was designed to accomplish. *See I.A.E., Inc.*, 49 N.E.3d at 157. Accordingly, we affirm the trial court's denial of Julie's motion for summary judgment on Richard's counterclaim for abuse of process.

### III. *Default Judgment*

[38] Lastly, Julie disputes the trial court's award of a default judgment as a discovery sanction in favor of Richard. The trial court issued the default judgment in Richard's counterclaim proceedings. Specifically, in an effort to fully litigate his counterclaim, Richard attempted discovery, seeking to establish when, if ever, Julie's counsel had reviewed Julie's divorce counsel's file and to obtain the fees and rates of Julie's attorney to demonstrate the reasonableness of his own attorney's fees. Finding, after two months, that Julie was not in compliance with Richard's discovery requests and motion to compel, the trial court entered a default judgment against her and subsequently awarded Richard attorney fees in the amount of $842,021. After an unsuccessful motion to set aside the default judgment pursuant to T.R. 60(B), Julie now appeals the decision.

[39] The trial court may relieve a party from a default judgment upon one of several grounds set forth in Indiana Trial Rule 60(B). *King v. United Leasing Inc.*, 765 N.E.2d 1287, 1289 (Ind. Ct. App. 2002). A trial court's decision as to whether to set aside a default judgment is given substantial deference on appeal. *Charnas v. Estate of Loizos*, 822 N.E.2d 181, 184 (Ind. Ct. App. 2005). Our review of the trial court's refusal to

set aside a default judgment is limited to determining whether there has been an abuse of discretion. *Id*. Thus, on appeal, the burden is on the appellant to demonstrate that the trial court's decision was clearly against the logic and effect of the facts and circumstances before the court, or that the trial court misinterpreted the law. *Id.* Although a default judgment plays an important role in the maintenance of an orderly, efficient judicial system as a weapon for enforcing compliance with the rules of procedure and for facilitating the speedy determination of litigation, in Indiana there is a marked judicial deference for deciding disputes on their merits and for giving parties their day in court, especially in cases involving material issues of fact, substantial amounts of money, or weighty policy determinations. *Id*.

[40] In her appellate brief, Julie advances several arguments on which the trial court's default judgment could be reversed—none of which explicitly invoke any of the grounds of T.R. 60(B). Nevertheless, we will attempt to address Julie's claims.

### A. *Relevance of the Discovery on Attorney Fees*

[41] Julie's main contention centers on the continued relevancy of her attorney fees in light of her acceptance of the reasonableness of Richard's attorney fees. She maintains that because she did not contest the reasonableness of Richard's attorney fees, the rate charged by her own attorneys became irrelevant and, thus, the trial court's order to compel was erroneous and, she was entitled to ignore it.

[42] Generally, Indiana follows the American Rule, which requires each party to pay his or her own attorney fees absent an agreement between the parties, statutory authority, or rule to the contrary. *Fackler v. Powell*, 891 N.E.2d 1091, 1098 (Ind. Ct.

App. 2008), *trans. denied*.  Here, the trial court awarded the fees pursuant to Indiana

Code section 34-52-1-1, which provides in relevant part, that the trial court

> [m]ay award attorney's fees as part of the cost to the prevailing party, if the court finds that either party:
>
> (1) Brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;
>
> (2) Continued to litigate the action or defense after the party's claim clearly became frivolous, unreasonable, or groundless; or
>
> (3) Litigated the action in bad faith.

By awarding statutory fees, the trial court may look at the responsibility of the parties

in incurring the attorney fees.  *Ind. High School Athletic Ass'n, Inc. v. Schafer*, 913

N.E.2d 789, 794 (Ind. Ct. App. 2009).  The trial court has personal expertise he or

she may use when determining reasonable attorney fees.  *Id*.

[43]    In considering the reasonableness of an attorney's fees, it makes no difference

whether the obligation to pay the fee is based on a statutory provision or on a prior

agreement.  *Boonville Convalescent Ctr., Inc. v. Cloverleaf Healthcare Servs., Inc.*, 834

N.E.2d 1116, 1127 (Ind. Ct. App. 2005), *trans. denied*.  Instead, the determination of

reasonableness of an attorney's fee requires consideration of all relevant

circumstances.  *Id*.  Specifically, we must look to Professional Conduct Rule 1.5(a),

which lists the following non-exclusive factors to be considered:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) The fee customarily charged in the locality for similar legal services;

(4) The amount involved and the results obtained;

(5) The time limitations imposed by the client or by the circumstances;

(6) The nature and length of the professional relationship with the client;

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) Whether the fee is fixed or contingent.

[44] Despite Julie's allegation that she did not dispute the reasonableness of Richard's attorney fee request, we conclude that Richard's discovery request for Julie's attorney's fees remained relevant. We emphasize that it is the trial court's responsibility—and not Julie's—to determine the reasonableness of Richard's request for an attorney fee award. As such, relevant evidence to absolve this responsibility is evidence which "is of consequence in determining the action." Ind. Evidence Rule 401(b). Faced with claims which sought an award of $80 million dollars, impugned

Richard's integrity, and resulted in numerous repetitive filings with voluminous discovery over more than a decade, the trial court would have been hard pressed to compare this situation with other "similar legal services." *See* Prof. Conduct R. 1.5(a). Accordingly, the amount that Julie expended for the exact same lawsuit reflects on the reasonableness of Richard's fees. The relevance of Julie's fees to Richard's fee petition is furthermore underscored by what this discovery disclosed. Although by her own admission her disclosure is "substantially" underreported, Julie has paid more than $3 million in fees and costs, while, by contrast, Richard expended $842,000. Because the amount Julie paid in fees and the rate charged by her attorneys is relevant to the fee issues remaining, the trial court did not abuse its discretion by compelling the discovery.

[45] Moreover, it should be noted that even though Julie persisted in arguing that she conceded the reasonableness of Richard's attorney fees, we conclude otherwise. Julie did not stipulate to the reasonableness of Richard's fees in her objection and response to the counterclaim discovery request, nor did she raise this issue until after Richard sought a default for her non-compliance with the order to compel discovery. Specifically, it is not until November 19, 2014, when Julie asserted that she "is not in a position to contest the reasonableness of [Richard's] attorney fees. That is not to say that [Julie] is admitting that fees are owed in any way or that the disclosed fees are admissible at trial. Only that [Julie] is not in a position to dispute the reasonableness of the disclosed fees during a trial in this matter." (Appellant's App. p. 1800). Mindful of the litigious character of this suit, we agree with Richard that "Julie's carefully chosen words freed her for a future flip-flop at a time when she

decided she was 'in the position' to contest Richard's fees." (Appellee's Br. p. 44).
Therefore, we decline to categorize Julie's statement as a stipulation to the
reasonableness of Richard's fees.

### B. *Lack of Warning before Entry of Default Judgment*

[46] Next, Julie contends that the trial court abused its discretion in entering a default
judgment as a discovery sanction because it had failed to give her advance warning
of this possible sanction. Indiana's discovery rules are designed to "allow a liberal
discovery process, the purposes of which are to provide parties with information
essential to litigation of the issues, to eliminate surprise, and to promote settlement."
*Brown v. Katz*, 868 N.E.2d 1159, 1165 (Ind. Ct. App. 2007). Discovery is intended to
require "little, if any supervision or assistance by the trial court." *Hatfield v. Edward J.
DeBartolo Corp.*, 676 N.E.2d 395, 399 (Ind. Ct. App. 1997), *reh'g denied, trans. denied*.
Although "concealment and gamesmanship were [once] accepted as part and parcel
of the adversarial process," we have unanimously declared that such tactics no
longer have any place in our system of justice. *Outback Steakhouse of Florida, Inc., v.
Markley*, 868 N.E.2d 65, 77 (Ind. 2006). Today, "the purpose of pre-trial discovery is
'to make a trial less of a game of blindman's bluff and more a fair contest with the
basic issues and facts disclosed to the fullest practicable extent.'" *Id*. (quoting *United
States v. Proctor & Gamble Co.*, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958)).

[47] However, when the goals of discovery are not being met, Indiana Trial Rule 37
provides the trial court with tools to enforce compliance. *Brown*, 868 N.E.2d at 1165
(citing *Hatfield,* 676 N.E.2d at 399). Indiana Trial Rule 37(B)(2) permits the trial

court to sanction a party for its failure to comply with discovery orders by, among other things, entering a default judgment against the party. As the Supreme Court has explained, the purpose of sanctioning discovery violations is "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 US. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976).

[48] Despite Julie's argument to the contrary, we have previously held that T.R. 37 does not require a trial court to impose a lesser sanction or warning before entering a default judgment. *Brown*, 868 N.E.2d at 1169; *Burns v. St. Mary Med. Ctr.*, 504 N.E.2d 1038, 1039 (Ind. Ct. App. 1987). Furthermore, even if the trial rules would have required a warning before imposing a default judgment as a discovery sanction, Julie had ample notice that her actions could trigger a default judgment. On November 10, 2014, Richard moved for a default judgment due to Julie's disregard of the trial court's motion to compel. At that point, Julie was warned that a future default judgment was a possibility. During the December 2, 2014 hearing, the parties extensively discussed the sanction of default. Nevertheless, instead of issuing a ruling, the trial court took the matter under advisement, allowing Julie time to comply with Richard's counterclaim discovery request. On January 14, 2015, the trial court issued the default judgment, after entering a finding that Julie had engaged in a "repetitive pattern" of disregarding the trial court's discovery order. (Appellant's App. p. 125). Accordingly, under these facts, Julie had a two-month warning that a default judgment had been requested and was impending.

[49] Moreover, we cannot say that this sanction is unduly harsh or unjust. As a general matter, trial courts "should seek to apply sanctions which have a minimal [e]ffect on the evidence presented at trial and the merits of the case." *Wright v. Miller*, 989 N.E.2d 324, 330 (Ind. 2013). In the instant case, the evidence reflects that the trial court entered the default judgment based on a lengthy and continuous history of disregard for the trial court's orders. Richard served Julie with the discovery request on his counterclaim on June 17, 2014. After Julie's objection, Richard filed a motion to compel, which was granted by the trial court on October 24, 2014. The trial court informed Julie that she had to comply by November 3, 2014. However, instead of serving the requested information on that day, Julie reiterated her objections to Richard's discovery. Three days later, Julie sought reconsideration of the trial court's order to compel, which was subsequently denied on November 24, 2014. On November 10, 2014, Richard requested a default judgment as a discovery sanction. Again, Julie objected, repeating the objections which had been rejected by the trial court twice already. On December 2, 2014, the trial court heard arguments and took the matter under advisement, to ultimately enter a default judgment on January 14, 2015.

[50] Throughout these proceedings, Julie offered no abatement of her misconduct; rather, her counsel admitted under oath that he did not even begin to gather the compelled discovery until the trial court took the matter under advisement. While we empathize with counsel's health problems, these did not incapacitate him until December 14, 2014, more than a month after the order to compel discovery had been entered. Given the trial court's earlier orders, Julie's insistence that the evidence

sought was not relevant or discoverable[3] was in bad faith and in contumacious disregard of the trial court's discovery order and motion to compel. Therefore, based on the unique facts before us, we agree with the trial court that the imposition of a default judgment was not unduly harsh.

## IV. *Attorney Fees Award*

[51] Lastly, Julie contends that the trial court erred when entering the order awarding attorney's fees without requiring Richard to litigate the underlying merits of his counterclaim. In *Shoulders v. State*, 462 N.E.2d 1034, 1035 (Ind. 1984), our supreme court noted that "[t]he effect of the default judgment is that the facts as alleged in the petition are deemed admitted. However, the court must determine whether as a matter of law the facts as alleged in the petition entitle the petitioner to relief." The record reflects that the underlying merits had been litigated and determined by the trial court when it rejected Julie's motion for summary judgment on Richard's counterclaim by order of October 2, 2013. At that point, the trial court concluded that "Richard can establish a misuse of process and Julie is not entitled to summary judgment." (Appellant's App. p. 108). By thereafter entering the default judgment against Julie on Richard's counterclaims, the trial court clearly established Julie's liability. By affirming the default judgment, we—by logical extension—also affirm

---

[3] Julie insisted that the Rules of Professional Conduct prevented her from complying with the discovery order, as the information requested was privileged information. However, as a general rule, information regarding a client's attorney fees is not protected by the attorney-client privilege because the payment of fees is not considered a confidential communication between attorney and client. *See, e.g., Hueck v. State*, 590 N.E.2d 581, 585 (Ind. Ct. App. 1992), *reh'g denied, trans. denied*.

Julie's liability on Richard's counterclaims. Julie may not now collaterally attack her liability on the counterclaims through the award of attorney fees.

[52] Furthermore, we cannot conclude that the trial court abused its discretion by entering an award of statutory attorney fees in favor of Richard. Indiana Code section 34-52-1-1(b) provides, in relevant part, that the trial court

> May award attorney's fees as part of the cost to the prevailing party, if the court finds that either party:
>
> (1) Brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;
>
> (2) Continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless, or
>
> (3) Litigated the action in bad faith.

[53] Mindful of these criteria, the trial court awarded fees "in light of Julie's conduct through this litigation, including but not limited to her disobedience of the [c]ourt's discovery order and the misrepresentation to the [c]ourt made relating to that order." (Appellant's App. p. 147). Specifically, the trial court noted that either Julie or her counsel have engaged in a pattern of misconduct that includes:

> (1) Misrepresenting (under oath) *when* her counsel reviewed the critical documents in [Julie's divorce attorney's] file. While counsel and Julie claim to have not reviewed that file until the [c]ourt ordered it disclosed in June of 2005, her counsel's own billing records reflect time entries for [the file's review] as early as February of 2004;

(2) Billing astronomical sums throughout the lawsuit, including more than 200 hours of meetings and telephone calls that apparently did not occur; and

(3) Continuing to delay resolution of a lawsuit that had no basis in law or fact years after that reality should have been obvious to any reasonable person.

(Appellant's App. p. 147).

[54] We review *de novo* the trial court's legal conclusion that a party litigated in bad faith or pursued a frivolous, unreasonable or groundless claim or defense, and then review the trial court's decision to award attorney fees and the amount thereof under an abuse of discretion standard. *Chapo v. Jefferson Co. Plan Com'n*, 926 N.E.2d 504, 509 (Ind. Ct. App. 2010). A claim or defense is "frivolous" if it is taken primarily for the purpose of harassment, if the attorney is unable to make a good faith and rational argument on the merits of the action, or if the lawyer is unable to support the action taken by a good faith and rational argument for an extension, modification, or reversal of existing law. *Id*. at 509-510. A claim or defense is unreasonable if, based on the totality of the circumstances, including the law and the facts knows at the time of filing, no reasonable attorney would consider that claim or defense was worthy of litigation. *Id*. A claim or defense is "groundless" if no facts exist which support the legal claim presented by the losing party. *Id*. A trial court is not required to find an improper motive to support an award of attorney fees; rather, an award may be based solely upon the lack of a good faith and rational argument in support of the claim. *Id*.

The facts, as recounted in this lengthy opinion, more than sufficiently justify the trial court's statutory fee award. The trial court was addressed by an attorney who failed to diligently research the file of his predecessor prior to launching into a protracted litigation, who filed motions in which he reiterated claims already rejected by the court, who was nonresponsive to discovery, and who persisted in litigation claims that had become clearly groundless or unreasonable. Mindful that "the statute strikes a balance between respect for an attorney's duty of zealous advocacy and the important policy of discouraging unnecessary and unwarranted litigation," here, Julie' attorney blatantly ignored his discovery obligations, trial court's orders, and continued to engage in questionable litigation tactics, overstepping the boundaries of zealous litigation and entering the realms of vexatious litigation. *Mitchell v. Michell*, 695 N.E.2d 920, 924 (Ind. 1998). Accordingly, we affirm the trial court's imposition of an attorney fee award.

## CONCLUSION

Based on the foregoing, we conclude as follows: (1) the trial court properly decided that Julie failed to establish that Richard had committed fraud during the negotiations leading to the Settlement Agreement; (2) the trial court properly denied Julie's motion for summary judgment on Richard's counterclaim for abuse of process; (3) the trial court's imposition of a default judgment was just; and (4) Richard is entitled to an award of attorney fees.

Affirmed.

Kirsch, J. and Pyle, J. concur